UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert W. PETERSON, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Wayne B. CLIZER, Defendant-Appellant.

Nos. 72–2480, 72–2481.

United States Court of Appeals,
Ninth Circuit.

March 13, 1973.

Rehearing Denied May 1, 1973.

807

C. E. Monty Hormel (argued), Ephrata, Wash., for defendants-appellants.

Dean C. Smith, U. S. Atty. (argued), Carroll D. Gray, Asst. U. S. Atty., Spokane, Wash., for plaintiff-appellee.

Before KOELSCH and WRIGHT, Circuit Judges, and EAST,[*] District Judge.

EAST, District Judge:

Defendant-Appellant Robert W. Peterson (Peterson) was indicted on one count of violation of Title 26 U.S.C. Section 5845(a) and Section 5861(d) (National Firearm Act).

Defendant-Appellant Wayne B. Clizer (Clizer) and Peterson were jointly indicted on an additional count of violation of the same sections and together with others an additional count of violation of Title 18 U.S.C. Section 371 (Conspiracy).

Peterson was convicted on all three counts and sentenced to custody on each, the terms to run concurrently. Clizer was convicted on Counts II and III and likewise sentenced. Each appeals and is at liberty on bail. We affirm.

STATUTES

Title 26 U.S.C.:

Section 5841—Registration of firearms.

(a) .. Secretary .. shall maintain a central registry of all firearms.

(b) .. Each manufacturer .. and maker shall register each firearm he .. makes.

Section 5845—Definitions.

For the purpose of this chapter—

(a) Firearm—The term "firearm" means (1) a shotgun having a barrel or barrels .. (Here follows through subparagraph (7) meticulous description of items of military ordnance and instrumentalities of crime.) .. and (8) a destructive device.

(f) Destructive Device—The term "destructive device" means (1) any .. incendiary, .. (A) bomb, (B) grenade .. or (F) similar device;

(3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) .. and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon;

INDICTMENT

The Grand Jury charges:

Count I

"In or about July 1970, .. at the James Thornton ranch .. , Peterson did knowingly, wilfully and unlawfully possess an incendiary and destructive device as the same is defined in 26 U.S.C. Section 5845(f) and 26 U.S.C. Section 5845(a)(7),[1] to-wit: an object composed of segments of fusees with gunpowder and incendiary ingredients and rope fuses attached, and the combination of said segments, gunpowder, ingredients and fuses, which were designed and intended

---

[*] Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. At argument on the motion to dismiss the indictment, the trial court ordered the deletion and obliterated in his own hand the numeral (7) pursuant to Rule 7(c) Federal Rules of Criminal Procedure: Error in the "citation of the statute . . .

or other provision of law . . . alleged . . . to have (been) violated . . . shall not be a grounds for dismissal . . . or reversal . . . if the error . . . did not mislead . . . defendant to his prejudice." The full scope of Section 5845 was under consideration and no party was misled by the erroneous numeral (7).

for use as such a device and from which said device might be readily assembled, not registered to him in the National Firearms Registration and Transfer Record in violation of Section 5861(d) of Title 26, United States Code."

In Count II the grand jury charged Peterson and Clizer and others not named as defendants of an additional crime in identical words set forth in Count I.

In Count III the grand jury charged that Peterson and Clizer with others "did unlawfully conspire, combine, confederate and agree with each other to commit offenses against the United States of America, that is: to knowingly, wilfully and unlawfully receive, possess, transfer and make incendiary and destructive devices as the same are defined in 26 U.S.C. Section 5845, to-wit: objects composed of segments of fuses with gunpowder and incendiary ingredients and rope fuses attached, and the combination of said segments, gunpowder, ingredients and fuses, which were designed and intended for use as such devices and from which said devices might be readily assembled; which would not be and were not registered to them or any of them in the National Firearms Registration and Transfer Record, which would not be and were not the subject of any application to the Secretary of the Treasury of the United States or his delegate, and for which no tax would be or was paid, in violation of 26 U.S.C. Section 5861; and in pursuance of said conspiracy and to effect the objects thereof; the said defendants performed the following overt acts, among others, to-wit:

4. In or about July, 1970 . . Peterson and . . Clizer ignited and demonstrated said incendiary and destructive devices at the Oscar Tschirky farm;

6. In or about July, 1970 . . Peterson, . . Clizer, Oscar Tschirky . . and three other persons met at the Oscar Tschirky potato warehouse and discussed the burning of haystacks with said incendiary devices in Franklin County on the same night as haystacks were to be burned in Grant County;"

(For brevity, the allegations of numbers 1, 2, 3, 5 and 7 additional overt acts are omitted.)

## ASSIGNMENT OF ERRORS

Peterson and Clizer assert the trial court erred in:

1) Failing to dismiss all counts in the indictment on the grounds that the respective counts allege and describe incendiary and destructive devices which do not fall within the purview of Section 5845 or any of those subdivisions or subclassifications or otherwise constitute "firearms" proscribed by the section;

2) Failing to dismiss the cause on the grounds that the government failed to prove the alleged incendiary or destructive device was in fact a firearm proscribed by the section;

3) Failing to grant the motion for a new trial or judgment of acquittal on the identical grounds asserted in assignment 2).

4) Giving its instruction number 9 to the jury on the grounds the instruction was fatally defective in defining the term destructive device, an erroneous statement of the law and tended to be confusing, misleading and prejudicial to Peterson and Clizer;

5) (a) Permitting the government the introduction or attempted introduction of evidence of other inflammatory well-publicized infamous events or crimes, distinct and separate to the crimes charged in the indictment and permitting evidence of malicious intent or "bad" motive to be introduced by the government regarding other matters of a prejudicial nature not necessary to proof of the crime charged and designed to show the appellants as "bad guys" or infamous personalities;

(b) Spotlighting and connecting the distinct and separate crimes of malicious

acts not shown to have been perpetrated by the appellants;

6) Failing to individually and extensively examine each juror on *voir dire* for possible prejudice resulting from the wide-spread publicity and in exploring the background of each, failing to permit counsel to conduct such *voir dire*, where all or substantially all of the prospective jury panel admitted having been exposed to possible prejudicial wide-spread news media publicity concerning a well-known series of multiple arson or crimes, which the Court preliminarily informed the panelmen were related to the crimes charged in the indictment.

## FACTS

In July of 1970, Peterson, accompanied by Oscar Tschirky, came to the farm of James Thornton located near Mesa in Franklin County, Washington. Peterson advised Thornton that they were there for the purpose of demonstrating a device to be used in setting fires. He explained how the device worked and set one off to demonstrate how it would work. For the explanation and demonstration he had a piece of fusee flare into which he poured flammable granulated material containing gun powder to which he added a short length of cotton rope. He lit the cotton rope to show how the cotton rope timed the igniting of the powder. When it ignited, there was a fast, fiercely-burning fire.

Subsequently, in the latter part of July of 1970, Peterson and Clizer came to the potato cellar of Tschirky near Mesa. They traveled in Peterson's car, where he again had gun powder, fusee material and rope fuse in the back. Tschirky summoned others to his potato cellar and a meeting then took place between Clizer and Peterson, Tschirky and three others. At this meeting, Peterson and Clizer discussed with the others in attendance plans for a large burning of hay in Grant County and stated that they wanted the Franklin County National Farmers Organization to participate, too.

Peterson and Clizer then showed to the others at the meeting a box containing fusees and segments of fusees, and proceeded to use these segments, gun powder and cotton rope in assembling and putting together devices as before.

Approximately three or four of these devices were prepared, lit and allowed to burn. In each case, the fuse was lit and when the rope fuse burned down to the point of contact with the material in the fusee casing it ignited and burned. Peterson and Clizer explained that they had experimented at length with the use of the cotton rope fuse and determined that the length of time it took to ignite the device could be controlled by the length of the rope fuse.

The defendants explained how the devices could be used for the purpose of setting haystacks on fire and discussed a list of haystacks that they intended to burn and the route which they intended to follow in burning these haystacks.

## THE DEVICES

From the evidence in the record we draw this narrative picture of the device prepared and demonstrated by Peterson and Clizer:

A three to four inch long casing and fuel segment of a fusee flare (commonly used as a highway or railroad hazard red visual warning signal) from which a portion of the fuel material inside the casing segment was removed. The removed fuel material was then mixed with an equal amount of gun powder. This mixture of material along with a piece of cotton rope was then inserted and tamped into the casing. The casing fragment, its impregnated fuel and the cotton rope were made tight with binding tape.

Charles Caswell, an explosive expert with the Treasury Department, was called as an expert witness in the field of clandestine do-it-yourself devices used to destroy property. He related that he had experimentally constructed the type of device described by the other witnesses. He stated that the device construct-

ed by these defendants had all of the characteristics of any conventional incendiary device, that is, a fuse, a priming mixture which ignited the main fuel, the fuel itself and a container for the device. He also stated that it produced an intensely hot flame burning at 18,000–20,800 degrees and is highly effective for use in the destruction of property or material.

He then compared the device in question with commercially manufactured and homemade-type military ordnance and weapons of crimes and violence, and explained that the device is comparable to a "Molotov cocktail" as well as certain types of incendiary grenades, and further gave the opinion that this device was a more efficient incendiary device for the purpose of setting haystacks afire than a "Molotov cocktail."

## DISCUSSION

■ While neither Peterson nor Clizer have raised a constitutional issue on the act, we note that the registration of firearms requirement does not involve self-incrimination. United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

*Assignments of Error I, II and III*

At the threshold we point out our ultimate conclusion as to the necessary and material elements of the crimes alleged in the three counts, leaving out the conspiracy element of Count III over which we have no issue. These material elements are:

1. The commercial materials mentioned, segments of fusee, gun powder and cotton rope, could be readily assembled into an incendiary bomb, grenade, . . . or "destructive device";

2. The respective defendants intended to use and did convert the materials into a bomb, grenade, . . . or "destructive device"; and

3. He or they dealt with the materials and objects so assembled (destructive device) in a manner prohibited by law (possession of unregistered firearms).

See United States v. Morningstar, 456 F.2d 278, pp. 281–282 (4th Cir., 1972).

■ Also, we conclude from the record that the government produced sufficient evidence, if believed, to prove the necessary and material elements of the crimes and the allegations of each of the counts as an issue of fact.

Accordingly, we consider the only issue raised under each of the assignments is that of the single issue of law raised in assignment I.

Peterson and Clizer urge, in short, that Section 5845 in its entirety outlaws only an incendiary bomb, grenade, missile, mine or destructive devices of military type weaponry which are dangerous or deleterious to human life and limb, hence the premise asserted in assignment I.

■ We have concluded from a perusal of the legislative history of the act that Congress was well aware of the rampant destruction of property and dangers to life and limb faced by the public through the use of converted military type weaponry and the street variety of homemade instruments and weapons of crime and violence. And with this awareness Congress intended to foster law and order among the public by the proscription of original and converted military type weapons and, also, the do-it-yourself type of similar devices and weapons of crime, violence and destruction.

Again, it is manifest from a reading of the various definitions of "firearms" set forth in Section 5845(a)(1) through (6) that Congress intended thereby to proscribe modified or altered firearms commonly known as military type ordnance.

It is likewise manifest that Congress proscribed devices other than military type ordnance through the language in subsection (a)(7)—a gangster type firearm attachment (silencer) and (8)—a "destructive device."

A "destructive device" under its definitions in Section 5845(f) is: (1) any

. . . incendiary, . . . (A) bomb, (B) grenade, . . . or (F) *similar device* (italics supplied). While the words "incendiary . . . (A) bomb, (B) grenade, . . ." do have a military type ordnance connotation, it is not necessarily so and particularly with "similar device." Else why was the phrase "similar device" added to the specifically named items. The device designed and put together by Peterson and Clizer as above delineated is in our opinion similar to and likened to an incendiary bomb or grenade dropped by a military plane or thrown by a soldier.

The "device" produced by Peterson and Clizer is a common street do-it-yourself variety of a readily hand-thrown incendiary bomb or grenade and a weapon or instrumentality of crime and violence capable of destroying property by fire.

Furthermore, Congress manifestly intended to proscribe friendly things when with evil intent they are combined or joined together to produce a hostile object or device through the language used in subsections (a), (f)(3). "Any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon."

Peterson and Clizer did just that. They took fusee flare segments, black powder, cotton rope and binding tape, each separately a friendly item, then with evil intent combined them and "readily assembled" a hostile destructive device likened to a Molotov cocktail of military ingenuity but a commonly used civilian weapon of crime and violence. They did not register the weapon and they exercised dominion and control of it.

The counts in the indictment so alleged and the government's evidence so showed.

We conclude the District Court did not err in overruling the two motions to dismiss the indictment and the motion for a new trial or judgment of acquittal. The foregoing construction and interpretation of Section 5845 in its entirety under the facts of this case and our conclusion has support in the rationale of these authorities: United States v. Oba, 448 F.2d 892 (9th Cir., 1971) (Seven sticks of dynamite wrapped in copper wire and equipped with fuses and blasting caps intended for use in destroying property of others. Judge Browning dissenting, p. 892); United States v. Davis, 313 F.Supp. 710 (D. Conn., 1970) (Empty bottles, strips of cotton, and can of gasoline held with intent to assemble a Molotov cocktail.); and *Morningstar*, supra (Four sticks of black powder pellet explosive fastened together with electric tape and several unattached blasting caps.) Citing Langel v. United States, 451 F.2d 957, 962 (8th Cir., 1971) (dynamite, fuse and cap); *Oba*, supra; *Davis*, supra; and United States v. Harflinger, 436 F.2d 928, 929 n. 1 (8th Cir., 1970) (by implication—dynamite, fuse, cap, wire, clock, and battery). See, also, United States v. Posnjak, 457 F.2d 1110, note 10, p. 1119 (2nd Cir., 1972), distinguishable on facts. Apparently contra, see Judge Browning's dissent, supra, citing United States v. Schofer, 310 F.Supp. 1292 (E.D.N.Y., 1970), both distinguishable on facts, here an assembled device.

*Issue No. IV*

The trial court rejected two government requested instructions on the definition of a "destructive device" and gave its own instruction number 9 as follows:

"Now, the laws of the United States provide in part as follows, that it shall be unlawful to possess a destructive device. A destructive device includes any incendiary device, or components thereof, which may be readily assembled, the function of which device is to ignite and destroy property. It must be similar to an incendiary or

fire bomb, or grenade, but need not be identical. Any article or device composed of a combustible material capable of producing sufficient heat to destroy property of any kind, and having components designed to ignite that combustible material, is under the laws an incendiary device similar to a fire or incendiary bomb or grenade. The term destructive device shall not include any device which is neither designed nor redesigned as a weapon for destruction of property."

Peterson and Clizer excepted to the instruction. In short, the grounds urged were basically identical with those urged in Assignments I, II, and III which we have concluded to be without merit.

■ We approve the instruction when linked with appropriate instructions on unlawful intent and nonregistry as was done here.

*Issue No. V*

■ We consider the language of this assignment an overword play of the nature of the facts and circumstances surrounding Peterson and Clizer. The "well publicized infamous events or crimes" associated with "bad guys" refers to the so called "Columbia Basin hay fires incident" given widespread publicity and concern at the time. As the evidence developed, it was those "infamous events or crimes" which became the sum and substance of the conspiracy count. The facts focused their spotlight upon Peterson and Clizer and they had to suffer the brilliance.

*Issue No. VI*

■ Basically, this assignment attacks the so-called "Arizona system" of selection of jury and the trial court's conduct of the *voir dire* thereunder. The system is extensively used in this Circuit and was approved in Amsler v. United States, 381 F.2d 37 (9th Cir., 1967), Haslam v. United States, 431 F. 2d 362 (9th Cir., 1970), cert. den., 402

U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 653 and United States v. Erickson, 472 F.2d 505 (9th Cir. 1973).

If it be that the prospective jurors were not examined personally one by one to the satisfaction of Peterson and Clizer, such is attributable to their failure to accept the trial court's invitation to submit questions aimed at eliciting the prospective juror's frame of mind. The facts and the trial court's rulings here just do not add up to the situation and picture presented in Silverthorne v. United States, 400 F.2d 627 (9th Cir., 1968), cert. den., 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633. In *Silverthorne,* the free press had contaminated the public with prejudicial material and the trial court had made rulings on objections and exceptions held to be prejudicial to basic and constitutional rights of the defendants. Our perusal of the record of the voir dire here places the trial court's conduct and examination of the prospective jurors well within the test of *Haslam,* supra, stated 431 F.2d at page 364:

"This court has repeatedly held that the scope of voir dire examination and the procedures to be used are matters within the sound discretion of the trial judge, and will not be disturbed on appeal unless the procedures used or the questions propounded are so unreasonable or devoid of the constitutional purpose as to constitute an abuse of that discretion. Rodgers v. United States, 402 F.2d 830 (9th Cir. 1968); Amsler v. United States, 381 F.2d 37 (9th Cir. 1967); Alverez v. United States, 282 F.2d 435 (9th Cir., 1960); Johnson v. United States, 270 F.2d 721 (9th Cir. 1959), cert. denied 362 U.S. 937, 80 S.Ct. 759, 4 L.Ed.2d 751. An examination of the record does not show that appellant was restricted in any manner from propounding further questions to the jury through the trial judge, or that a refusal to ask any specific question was prejudicial to him. The record

does not disclose that there was an abuse of discretion by the trial court."

Peterson and Clizer's several enlargements on bail are revoked, effective now.

Affirmed.