UNITED STATES of America,
Plaintiff–Appellee,

v.

William Dean HEDGCORTH,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Franklin Joseph CAMPER,
Defendant–Appellant.

Nos. 87–5169, 87–5170.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1989.

Decided May 5, 1989.

---

Peter M. Horstman, Federal Public Defender, and Dennis J. Landin, Sr. Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant Hedgcorth.

John F. Walter and Gregory C. Glynn, Walter, Finestone, Richter & Kane, Los Angeles, Cal., for defendant-appellant Camper.

Robert C. Bonner, U.S. Atty., Robert L. Brosio, Asst. U.S. Atty., Chief, Crim. Div., and Charles J. Stevens, Sp. Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before WALLACE, FARRIS and BEEZER, Circuit Judges.

FARRIS, Circuit Judge:

The government charged William Dean Hedgcorth and Franklin Joseph Camper with multiple violations of federal explosives and firearms laws arising out of two automobile firebombings and the attempted firebombing of a house. Both defendants were found guilty of conspiracy to destroy property and to possess and use "incendiary destructive devices," in violation of 18 U.S.C. §§ 371, 844(i) and 924(c), and 26 U.S.C. § 5861(d); two counts of the knowing use of an "incendiary destructive device" during a federal crime of violence, in violation of 18 U.S.C. § 924(c); and racketeering, in violation of 18 U.S.C. §§ 1962(c), 1963(a). Hedgcorth and Camper appeal on the ground that the firebombs which they allegedly used did not constitute "destructive devices" within the meaning of 18 U.S. C. § 921(a)(4) because they were incapable of being thrown, wielded or aimed. In addition, Camper argues that various evidentiary rulings made by the trial court deprived him of his right to present a defense, the right to confront adverse witnesses, and the right to a fair trial. We affirm.

## FACTS

The evidence, viewed in the light most favorable to the government, established the following facts.

In 1985, Franklin Joseph Camper was the owner and operator of the "Mercenary Association," a mercenary training school located near Birmingham, Alabama. William Dean Hedgcorth, James LaRosa Cuneo, and Paul Johnson were students and teaching assistants at the Mercenary Association. Elizabeth Hamilton and Charlotte Wycoff owned and operated the California Learning Centers, a chain of private schools located in San Bernardino and Orange Counties in California.

In late July 1985, Hamilton and Wycoff contacted Camper in connection with a series of employment problems at the Learning Centers. Hamilton and Wycoff requested help in dealing with three teachers, two of whom had brought state unfair labor practice charges against the Learning Centers after they were fired. Camper recruited Hedgcorth, Cuneo, Johnson, and his girlfriend, Lee Ann Faulk, to do some

"unconventional security work." His plan was to locate the disgruntled teachers and "_____ them up."

Camper, Hedgcorth and the other mercenary co-defendants traveled to California and set up operations inside adjacent rooms in an airport motel. The defendants purchased two military manuals at a local war surplus store. One of the manuals, entitled "Unconventional Warfare Devices and Techniques—Incendiaries," contained a chapter on making napalm incendiary devices. Following instructions contained in this chapter, the defendants formed an assembly line in one of the motel rooms and built several firebombs which they hoped would produce a "napalm-type" effect when ignited.

The firebombs were constructed out of plastic water jugs filled with gasoline, motor oil, and soap. The liquids combined to produce a gelatinous mixture chemically equivalent to napalm. When ignited, napalm produces a more intense, more confined, and longer-lasting incendiary effect than gasoline alone. In order to create this effect, the mercenaries needed to ignite the firebombs by hand. The firebombs contained no fuses or other self-contained detonation mechanisms; they could not have been ignited and then thrown at a desired target.

After a series of practice runs, the mercenaries went to work on the early morning of August 13, 1985. At approximately 3:00 a.m., the defendants drove to the home of one of the disgruntled teachers. The defendants placed two of the firebombs under the teacher's car, poked holes in the plastic container, and lit the napalm-like mixture with a rolled-up newspaper. The defendants then fled. The firebombs produced the desired napalm effect and the car was nearly totally destroyed. The defendants followed the same essential procedure at the home of the second disgruntled teacher. Again, the teacher's car was almost totally destroyed. The heat from the firebombs was so intense that it melted the paint on the teacher's house. The defendants abandoned plans to firebomb the house of the third disgruntled teacher when they noticed a police car nearby.

There were no witnesses to either firebombing. Cuneo and Johnson testified for the government as part of a plea agreement. They stated that Camper orchestrated the arson spree, and that Camper and Hedgcorth were both involved in setting off the firebombs. Camper and Hedgcorth denied any involvement in the preparation or use of the firebombs. They argued that they had carried out a legitimate investigation, and that the firebombings were a "frolic and detour" committed by Johnson and Cuneo alone.

At the second trial,[1] Camper sought to show that the firebombings were consistent with Johnson's past history and inconsistent with his own. In support of this theory, Camper offered evidence regarding his history as a Vietnam war veteran, a writer of novels and magazine columns on military matters, the operator of a respectable mercenary school, and a participant in high level intelligence work, including work for the United States and other governments. The trial court disallowed much of this evidence on hearsay and relevance grounds, and on the grounds that evidence of a patriotic or pro-government character is inadmissible under Fed.R.Evid. 404(a). The trial court also limited inquiry into prior bad acts committed by Johnson and several of the government's other witnesses.

The jury returned verdicts of guilty against both Hedgcorth and Camper on the conspiracy and racketeering counts and the two counts of using an "incendiary destructive device." It was unable to reach decision on three underlying counts charging arson and attempted arson. The trial court sentenced Hedgcorth to a five year prison term on one count of using a destructive device (the mandatory sentence), and a consecutive five year probation term on the conspiracy and racketeering counts. Impo-

---

**1.** The trial court declared a mistrial after the first trial when the jury stated that it was unable to reach a verdict.

sition of sentence on the second count of using a destructive device was stayed, in accordance with our holding in *United States v. Palafox*, 764 F.2d 558, 563–64 (9th Cir.1985) (en banc). The trial court sentenced Camper to a nine year prison term on the racketeering count, a consecutive five year prison term on one count of using a destructive device, and a consecutive five year probation term on the conspiracy count. Imposition of sentence on the second count of using a destructive device was stayed.

Both defendants filed a timely Notice of Appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

### DESTRUCTIVE DEVICE

■ Title 18 U.S.C. § 924(c)(1) provides a mandatory five year prison sentence for anyone who uses a "firearm" "during and in relation to any crime of violence or drug trafficking crime." The term "firearm" includes a "destructive device." 18 U.S.C. § 921(a)(3). A "destructive device" is defined as:

any explosive, incendiary, or poison gas—
  (i) bomb,
  (ii) grenade,
  (iii) rocket having a propellant charge of more than four ounces,
  (iv) missile having an explosive or incendiary charge of more than one-quarter ounce,
  (v) mine, or
  (vi) device similar to any of the devices described in the preceding clauses....

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon. 18 U.S.C. § 921(a)(4).

Defendants argue that the napalm firebombs are not "destructive devices" within the meaning of section 921(a)(4). None of our prior cases have discussed the definition in section 921(a)(4). However, the definition is the same as that found in 26 U.S.C. § 5845(f). The two provisions share a common legislative history. *See United States v. Oba*, 448 F.2d 892, 893–94 (9th Cir.1971), *cert. denied*, 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972). Our cases construing 26 U.S.C. § 5845(f) provide guidance in construing 18 U.S.C. § 921(a)(4).

The trial court instructed the jury as follows:

A destructive device includes any incendiary device, be it a military-type weapon or homemade incendiary product, or components thereof, the function of which is to ignite and destroy property. It must be similar to an explosive or incendiary bomb, grenade, missile, or firebomb, but need not be identical.

Any device composed of a combustible material capable of producing sufficient heat to destroy property of any kind and having components designed to ignite that combustible material is under the law an incendiary device similar to a fire or incendiary bomb.

The term "destructive device" does not include any device which is not designed or redesigned as a weapon for the destruction of property.

These instructions are virtually identical to those we approved in *United States v. Peterson*, 475 F.2d 806, 811–12 (9th Cir.), *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed. 2d 93 (1973). The issue is whether there was evidence from which a reasonable jury could conclude beyond a reasonable doubt that the firebombs were destructive devices. *See United States v. Reed*, 726 F.2d 570, 576 (9th Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984). *See generally Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

It is undisputed that the napalm firebombs were capable of causing, and did cause, great incendiary damage. In determining whether a device is "designed or redesigned for use as a weapon," we consider two factors: "[1] the nature of the device and [2] the intent with which it was constructed and used." *Reed*, 726 F.2d at 576. Defendants have not created a reasonable doubt with regard to either of these factors.

The nature and characteristics of the napalm firebombs support the jury's conclusion that they were designed for use as weapons. The government offered unrebutted expert testimony that the napalm firebombs were capable of producing a more intense, more concentrated and longer-lasting incendiary effect than less exotic explosives. Moreover, the mercenaries explicitly patterned the firebombs after sophisticated military ordnance. *See Peterson*, 475 F.2d at 811 (device constructed out of a modified flare, black powder, cotton rope, and binding tape was designed as a weapon, because it was "a hostile destructive device likened to a Molotov cocktail of military ingenuity"). In enacting section 921(a)(4), Congress was primarily concerned with responding to the threat posed by "heavy military ordnance that ha[s] no legitimate private use." *Oba*, 448 F.2d at 897, 897–901 (Judge Browning, dissenting) (discussing legislative history). Napalm firebombs fall well within the statute.

The defendants' intent also supports the jury's conclusion that the firebombs were designed for use as weapons. There was overwhelming evidence that the mercenaries built the firebombs for the sole purpose of destroying property and intimidating people. The government introduced evidence that the mercenaries used napalm in order to do "enough damage to scare these people." *See Oba*, 448 F.2d at 894 (dynamite wrapped in copper wire and equipped with a fuse and blasting caps was designed for use as a weapon, because defendant admitted that his intent was to use the device "to dynamite the City of Eugene, Oregon"). Defendants offered no evidence that the firebombs were designed for any legitimate purpose.

Defendants base their appeal on a single passage in *Reed*. In *Reed*, we held that paper-wrapped, gasoline-filled beverage cans with holes poked in the top did not constitute "destructive devices." We stated:

These cans were not in fact used as weapons. They could not well have been so used, for it would have been difficult and dangerous for a person to hold such a can, ignite the paper and then successfully use or throw the can without serious harm to himself. Nothing in the record indicates that a device of this kind, although capable of causing great incendiary damage, bears the traditional indicia of a weapon, or had such a possible use.

726 F.2d at 576. Defendants argue that *Reed* establishes a firm rule that a device is not designed for use as a "weapon," and therefore may not constitute a "destructive device," unless it is capable of being thrown, aimed or wielded.

Defendants read *Reed* far too broadly. There is nothing in the legislative history of 18 U.S.C. § 921(a)(4) or 26 U.S.C. § 5845(f) remotely suggesting an exception for dangerous, explosive devices which are incapable of being thrown. *See United States v. Ragusa*, 664 F.2d 696, 700 (8th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982). Unlike napalm firebombs, gasoline cans with holes poked in the top are common items adapted to many legitimate uses: cleaning paint brushes, storing fuel for small machinery, etc. An expert in this case testified that napalm firebombs are not adapted to any legitimate civilian purpose. Although in some cases the fact that a device cannot be thrown may be sufficient to create a reasonable doubt that the device was designed for use as a weapon, this is not such a case. The trial court properly instructed the jury on the definition of a destructive device. The evidence was more than sufficient to support the jury's conclusion.

## EVIDENTIARY RULINGS

Camper challenges various evidentiary rulings[2] made by the trial court. He argues that these rulings improperly prevented him from showing that he was a

---

**2.** Some of the challenged rulings were made in response to motions in limine brought by the government before trial. Others were made as the trial unfolded. The standard of review is the same in each case. *See United States v. Poschwatta*, 829 F.2d 1477, 1481, 1483 (9th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988).

"thoughtful," "peaceable mercenary" who was betrayed by the random acts of reckless colleagues. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Gwaltney*, 790 F.2d 1378, 1383–84 (9th Cir.1986), *cert. denied*, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987).

■ Camper first objects to the trial court's decision to foreclose inquiry into his role as an intelligence operative for the United States government and the legitimate use of the Mercenary Association in those operations. The trial court properly held such evidence inadmissible to the extent that it was offered to show that Camper was a "patriotic," "pro-government" individual unlikely to engage in acts of terrorism. Under Fed.R.Evid. 404(a), evidence of a trait of character is inadmissible to show that defendant acted in conformity therewith on a particular occasion. The trial court invited Camper to articulate an alternative theory of relevance. After making and withdrawing an initial proffer, Camper failed to do so. On appeal, Camper argues that his history of involvement with the government is relevant to show his lawful character. However, while a defendant may show a character for lawfulness through opinion or reputation testimony, *see Michelson v. United States*, 335 U.S. 469, 476, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948), evidence of specific acts is generally inadmissible. *Id.* at 477, 69 S.Ct. at 219; *United States v. Barry*, 814 F.2d 1400, 1403 (9th Cir.1987). *See* Fed.R.Evid. 405. The trial court's limitation of Camper's testimony was not an abuse of discretion.

■ Camper next argues that the trial court abused its discretion in sustaining the government's hearsay and relevance objections to material written by Camper and offered to show his peaceful mercenary philosophy. Camper argues that the writings were admissible under the state of mind exception to the hearsay rule. Fed.R. Evid. 803(3). This argument lacks merit. Camper's prior writings have no bearing on his state of mind during offenses commit-

ted years later. *See Barry*, 814 F.2d at 1404.

■ Camper argues that the trial court improperly excluded evidence regarding his character for truthfulness. The trial court held that an FBI agent could not testify as to Camper's truthfulness because the government had not attacked Camper's character for truthfulness. *See* Fed.R. Evid. 608(a). Camper argues that the government had placed his character for truthfulness at issue by including, as one object of the conspiracy, the charge that Camper and his co-conspirators agreed to cover up their knowledge of the firebombings. However, the government dropped this charge from the indictment before trial. The fact that some of the evidence may have shown that defendant conspired to cover up his crime does not mean that defendant's character for truthfulness "has been attacked by opinion or reputation evidence or otherwise." Fed.R.Evid. 608(a). *See United States v. Thomas*, 768 F.2d 611, 618 (5th Cir.1985). The trial court did not abuse its discretion in excluding the FBI agent's testimony.

■ Camper argues that several of the trial court's evidentiary rulings deprived him of his right to confront adverse witnesses. The trial court precluded Camper from cross-examining the victims of the firebombings about prior drug use. The court also limited cross-examination about Paul Johnson's prior acts of violence and vandalism, and prevented Camper from mentioning Johnson's ten-year old misdemeanor conviction for forgery. The trial court did not abuse its discretion in foreclosing inquiry into past drug use by the teachers since Camper made no foundational showing that the evidence was relevant to the teachers' credibility as witnesses. *See United States v. Domina*, 784 F.2d 1361, 1365–66 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). The trial court allowed Camper to cross-examine Johnson about his prior acts of violence to the extent that they related to possible bias or motive to fabricate. It was not an abuse of discretion to limit further cross-examination. *See* Fed.R.

Evid. 608(b). Finally, the trial court did not abuse its discretion in precluding mention of a misdemeanor conviction over ten years old offered for purposes of impeachment. *See* Fed.R.Evid. 609(b).

Camper alleges other errors in the trial court's evidentiary rulings. We have carefully examined these claims. They all lack merit.

AFFIRMED.