**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Terry Bruce LUSSIER, Defendant–Appellant.**

**No. 96–50531.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1997.

Decided Nov. 3, 1997.

Jeremy D. Warren and Christopher P. Tenorio, Federal Defenders of San Diego, Inc., San Diego, CA, for defendant-appellant.

Barbara L. Major and Jill L. Burkhardt, Assistant United States Attorneys, San Diego, CA, for plaintiff-appellee.

Before: HALL and T.G. NELSON, Circuit Judges, and WINMILL,* District Judge.

T.G. NELSON, Circuit Judge:

Terry Bruce Lussier appeals his conviction for possession of firearms by a convicted felon in violation of 18 U.S.C. § 922(g)(1) based on his possession of homemade $CO_2$ explosive devices.[1] Lussier contends that because the explosive devices were not commercially manufactured, the Government was required to prove that he actually intended to use the devices as weapons. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Because we conclude that the Government was not required to prove Lussier's intent in possessing the devices, we affirm.

I

Federal agents seeking stolen Government property executed a search warrant on the home of Terry Bruce Lussier. In addition to the stolen property, they found a variety of homemade explosive devices. These devices included six $CO_2$ cartridges, each filled with explosive powder and containing a fuse.

Lussier was indicted on three counts: theft of government property, 18 U.S.C. § 661; possession of unregistered firearms, 26 U.S.C. § 5861(d); and possession of firearms by a convicted felon ("felon in possession"), 18 U.S.C. § 922(g)(1). Lussier pleaded guilty to the theft charge, but went to trial on the other two charges. The jury found him not guilty on the possession of an unregistered firearm charge, but deadlocked on the felon in possession charge. Because of the deadlock, a mistrial was declared, and a new trial was held on the felon in possession charge.

Prior to the new trial, Lussier filed a motion in limine, arguing that to convict him of the felon in possession charge, the Government was required to show that he actually intended to use the homemade $CO_2$ explosive devices as weapons. The district court denied the motion.

The jury found Lussier guilty of being a felon in possession of a firearm. The district court denied Lussier's motion for a new trial. This timely appeal followed.

II

Lussier raises two arguments on appeal: (1) that the district court erred by failing to require proof that Lussier intended to use the $CO_2$ devices as weapons; and (2) that the district court committed plain error by calling the $CO_2$ devices "destructive devices" in front of the jury. We address each of these arguments in turn.

A. Intent to Use Devices as Weapons

Lussier argues that, because the $CO_2$ devices were homemade and not commercially manufactured, the Government was required to prove that he intended to use the devices as weapons. We review this question of law de novo. See United States v. Ruiz, 73 F.3d 949, 952 (9th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 130, 136 L.Ed.2d 79 (1996).

Lussier was convicted of being a "felon in possession of a firearm" in violation of 18 U.S.C. § 922(g)(1).[2] "Firearm" includes

---

* Honorable B. Lynn Winmill, United States District Judge for the District of Idaho, sitting by designation.

1. "Firearm" includes "any destructive device." 18 U.S.C. § 921(a)(3).

2. Section 922(g)(1) provides in relevant part: It shall be unlawful for any person-(1) who has been convicted in any court[ ] of a crime punishable by imprisonment for a term exceeding one

"any destructive device." 18 U.S.C. § 921(a)(3).

   (4) The term "destructive device" means—

     (A) any explosive, incendiary, or poison gas—

       (i) bomb,

       (ii) grenade,

       (iii) rocket . . .,

       (iv) missile . . .,

       (v) mine, or

       (vi) device similar to any of the devices described in the preceding clauses;

     . . . .

     (C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) . . . and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon. . . .

18 U.S.C. § 921(a)(4).

The district court allowed the Government to proceed under § 921(a)(4)(A) ("subsection (A)") on the theory that the $CO_2$ devices were "device[s] similar" to explosive bombs or grenades. Lussier contends that in doing so the district court erred. He argues: (1) that because the $CO_2$ devices were not commercially manufactured, they fall under § 921(a)(4)(C) ("subsection (C)") as a "combination of parts"; and (2) that because the $CO_2$ devices fall under subsection (C), the Government was required to prove that he intended to use the devices as weapons.

Under Ninth Circuit precedent, if the devices fall under subsection (C) as a "combination of parts," the Government was required to prove either that the devices were *designed* for use, or that Lussier *intended* to use the devices, "in converting any device into a destructive device." Lussier's intent in possessing the $CO_2$ devices would therefore be a material element of the Govern-

ment's case, unless the Government chose to proceed under a design theory. *See United States v. Fredman,* 833 F.2d 837, 839 (9th Cir.1987); *United States v. Oba,* 448 F.2d 892, 894 (9th Cir.1971).[3] On the other hand, if the devices fall under subsection (A) as "device[s] similar to" a bomb, grenade, etc., the Government was *not* required to show Lussier's intent in possessing the $CO_2$ devices because intent is not an element of the crime. Thus, the question that we must answer is whether the $CO_2$ devices are "devices similar to" explosive bombs, grenades, etc., under subsection (A), or, instead, a "combination of parts" under subsection (C). To answer this question, we first examine the statutory framework of both subsection (A) and (C). We then examine the distinction between the two subsections. Finally, we determine under which subsection the $CO_2$ devices fall.

### 1. *Statutory Framework*

#### a. *Subsection (A)*

Under subsection (A), five categories of materials-bombs, grenades, mines, and certain types of rockets and missiles-are considered destructive devices per se. 18 U.S.C. § 921(a)(4)(A)(i-v). A device falling into one of these categories is considered a destructive device unless it "is neither designed nor redesigned for use as a weapon." 18 U.S.C. § 921(a)(4). These categories include, for example, military ordnance or devices such as stun grenades explicitly designed for certain law enforcement activities. *See Ruiz,* 73 F.3d at 951–52.

Subsection (A)(vi), a catchall category, provides that any device having substantially the same function or effect as bombs, grenades, etc., will be considered a destructive device (unless neither designed nor redesigned as a weapon). 18 U.S.C. § 921(a)(4)(A)(vi).

#### b. *Subsection (C)*

Under subsection (C), "any *combination of parts* either designed or intended for use in

---

year . . . [to] possess . . . any firearm or ammunition. 18 U.S.C. § 922(g)(1).

**3.** . The definition of a destructive device in § 921 is virtually identical to that in the statute prohib-

iting unregistered possession of these objects, 26 U.S.C. § 5845(f). We can therefore look to cases interpreting § 5845(f) for guidance in interpreting § 921. *See United States v. Hedgcorth,* 873 F.2d 1307, 1311 (9th Cir.1989).

converting any device into any destructive device described in subparagraph (A) ... and from which a destructive device may be readily assembled" is considered a "destructive device" (again unless neither designed nor redesigned as a weapon). 18 U.S.C. § 921(a)(4)(C) (emphasis added). Subsection (C) thus explicitly requires proof that (1) a combination of *parts;* (2) was either *designed or intended;* (3) for use *in converting;* (4) a device into a destructive device (as defined in subsection (A)); and (5) can be readily assembled.

### 2. Distinction Between Subsections (A) and (C)

On its face, subsection (C) applies only to materials that have not yet been assembled into a whole: it speaks of *"parts"* designed or intended *"for use in converting"* something into a bomb or similar device. In contrast, subsection (A) applies only to an assembled device, i.e., parts that *have been converted* into a bomb or similar device. Under the plain language of these subsections, a device that is already fully assembled will fall under subsection (A), but unassembled component parts will fall under subsection (C).[4]

As to the requirement that intent be shown, subsection (C) explicitly requires proof that a combination of parts are either "designed" or *"intended"* to be used in converting something into a bomb or similar device. Thus, unless the Government chooses to proceed under a "design" theory, it would need to prove that a defendant "in-tended" to use the parts to convert something into a bomb or similar device.

In contrast, subsection (A) does not contain an intent requirement. If a fully assembled device is either one of, or "similar to," the per se destructive devices, the fully assembled device is a "destructive device" regardless of the possessor's intent. As we stated in *Ruiz:*

> Since "parts" aren't necessarily a weapon, the statute requires intent to use them as a weapon. By contrast here, there is no dispute that the stun grenade is a fully assembled "grenade," § 5845(f)(1)(B); the only question is whether it is, or is not, designed for use as a weapon. We therefore hold that the defendant's intent to use the fully assembled stun grenades as a weapon is not a necessary element.

73 F.3d at 951.

Lussier misconstrues our precedent in this area of the law when he argues that subsection (A) applies only to commercially produced destructive devices and not to homemade devices, and that homemade devices require a showing of intent. This circuit has never differentiated between homemade and commercially produced devices in the matter of requiring intent. Rather, we have consistently held that although either intent or design is required as an element of the crime under subsection (C), a showing of intent is not required under subsection (A). To clarify the distinction between subsections (A) and (C) further, we briefly discuss the use of intent as an element of proof under subsec-

---

4. There is, however, one exception to the general rule that subsection (C) will be applied only to unassembled "parts": when the device at issue has a legitimate social purpose, i.e., was "neither designed nor redesigned for use as a weapon," it is considered a destructive device only if, pursuant to subsection (C), it has been "converted" into a destructive device by the possessor's "design" or "intent" to use it as a weapon. *See Oba,* 448 F.2d at 894.

For example, in *Oba,* the defendant possessed "seven sticks of dynamite wrapped in copper wire and equipped with fuse and blasting caps" which he intended to use to destroy premises in Eugene, Oregon. *Id.* Commercial blasting materials such as dynamite and blasting caps do not ordinarily come under the definition of destructive devices because they are neither "designed nor redesigned for use as ... weapon[s]." 26 U.S.C. § 5845(f). However, we found that an object made of these materials "may be 'converted' into a destructive device ... by way of 'design or intent.'" 448 F.2d at 894. Oba's *intent* to use the materials as a weapon *"converted"* a legitimate device into a destructive device. *See id.*

Lussier's reliance on *Oba* to support his argument that all homemade devices fall under subsection (C) as "a combination of parts," rather than under subsection (A), is misplaced. It was our emphasis on the process of conversion by destructive intent, not a differentiation between homemade and commercial weapons, that led us to apply the "combination of parts" section to Oba's device. *See id. See also United States v. Curtis,* 520 F.2d 1300, 1303 (1st Cir.1975) (holding that a "familiar industrial blasting charge" would be considered a destructive device only "if intended for use as a bomb").

tion (A) and intent as an element of the crime under subsection (C).

### a. Intent as an Element of Proof Under Subsection (A)

Despite the fact that proof of intent is not an element under subsection (A), we have sometimes looked to a possessor's intent as evidence of whether a device was "designed [or] redesigned for use as a weapon."

For example, in United States v. Hedgcorth, 873 F.2d 1307, 1310 (9th Cir.1989), the defendants had constructed napalm-type firebombs out of plastic water jugs, gasoline, motor oil, and soap. In determining whether there was sufficient evidence to support a jury finding that firebombs were "destructive devices" under § 921(a)(4), this court looked to "[1] the nature of the device and [2] the intent with which it was constructed and used." Id. at 1311. Evidence was offered that the firebombs had a concentrated and long-lasting incendiary effect and were explicitly patterned after military ordnance. Based on this evidence, we concluded that "[n]apalm firebombs fall well within the statute." Id. We went on to note that the defendants' intent of intimidating persons through property destruction "also support[ed] the jury's conclusion that the firebombs were designed for use as weapons." Id. (emphasis added). Evidence of the defendants' destructive intent buttressed the jury's finding that firebombs were "destructive devices." A finding of intent was not, however, a necessary element of the crime.

In reaching our holding in United States v. Reed, 726 F.2d 570 (9th Cir.1984), that punctured, "paper-wrapped, gasoline-filled beverage cans" involved in an arson attempt were not "designed" as weapons, we did not even reach the defendants' actual incendiary intent. Id. at 573, 576. Instead, we relied on the nature of the devices: "They could not well have been [used as weapons], for it would have been difficult and dangerous for a person to hold such a can, ignite the paper and then successfully use or throw the can without serious harm to himself." Id. at 576. We concluded that this design, without "the traditional indicia of a weapon," would pre-vent a reasonable jury from concluding the cans were destructive devices. Id.

Finally, in United States v. Peterson, 475 F.2d 806 (9th Cir.1973), the defendants held meetings promoting arson and demonstrating the manufacture of simple incendiary bombs. Id. at 809. The indictment charged possession of both a completed incendiary device and the raw materials for manufacturing more. See id. at 807–08. This court held that the defendants' "evil intent" to combine "friendly things" (the raw materials) into "a commonly used civilian weapon of crime and violence" was enough to bring fusee flares, cotton fuse, gunpowder, and binding tape under the statutory definition of destructive devices. See id. at 811. Thus, although we did consider the defendants' intent, we did so only with regard to the "raw materials" or "components."

As to the incendiary device produced from the raw materials, we did not look to the defendants' intent, but rather to the nature of the completed device. Because the completed device fell under the "similar device" clause as a "common street do-it-yourself variety of a readily hand-thrown incendiary bomb or grenade," it was "similar to" military ordnance. Id.

Our conclusion in Peterson that a homemade incendiary device was an "incendiary bomb or grenade," even without a showing of the possessor's intent, comports with the decisions of other circuits. See, e.g., United States v. Markley, 567 F.2d 523, 524, 527 (1st Cir.1977) (holding that toilet paper rolls filled with black powder and equipped with fuses are destructive devices under 26 U.S.C. § 5845(f) "regardless of their intended purpose").[5] Accord United States v. Lisk, 559 F.2d 1108, 1109 n. 1, 1111 & n. 4 (7th Cir. 1977) (pipe bomb); United States v. Cruz, 492 F.2d 217, 219 (2d Cir.1974) (Molotov cocktail); United States v. Ross, 458 F.2d 1144, 1145–46 (5th Cir.1972) (Molotov cocktail).

### b. Intent as an Element of the Crime Under Subsection (C)

In contrast to the use of intent under subsection (A) as evidence of design, under

---

**5.** This court has previously indicated its approval of Markley. See Ruiz, 73 F.3d at 952.

subsection (C) intent is generally an *element of the crime.*[6] To convict a defendant under subsection (C), the Government must show that the defendant either *"designed* or *intended"* to convert a combination of parts into a weapon. 18 U.S.C. § 921(a)(4)(C). Without proof of either "design" or "intent," the defendant cannot be convicted.

Subsection (C)'s requirement that either intent or design be proven as an element of the crime makes intuitive sense: since "parts" are not necessarily "weapons," subsection (C) requires a showing of either design or intent to "convert" the devices into a weapon. *See Ruiz,* 73 F.3d at 951; *see also United States v. Fredman,* 833 F.2d 837, 838–39 (9th Cir.1987) (holding that intent to use components as a weapon was a "necessary element" of finding that they constituted destructive devices where record clearly disclosed they were designed for an innocent use); *Curtis,* 520 F.2d at 1303; *Oba,* 448 F.2d at 894.

### 3. *The Present Case*

The fully assembled $CO_2$ devices were not "parts" under subsection (C), but were instead fully assembled "device[s] similar to" bombs, grenades, etc. Furthermore, the $CO_2$ devices were not, like the blasting charges in *Oba,* socially useful items that could only be converted into destructive devices by Lussier's intent to use them as weapons. Rather, they were "common street do-it-yourself ... bomb[s]." *Peterson,* 475 F.2d at 811. They therefore fell under subsection (A) where proof of intent is not required. *See Ruiz,* 73 F.3d at 951.

Moreover, unrebutted evidence at trial showed that the nature and characteristics of the $CO_2$ devices made them useful solely as weapons. *See Hedgcorth,* 873 F.2d at 1312. Because their nature and characteristics convincingly demonstrated that they were designed as weapons, no auxiliary evidence con-

cerning Lussier's intent to use them as weapons was required. *Id.* The district court's ruling that Lussier's intent was not an element of the Government's case was therefore proper.[7]

### B. *District Court Remarks*

After the jury instructions were read but prior to the jurors entering the jury room, the district court judge told the jurors they could look at the $CO_2$ devices, stating:

> The actual destructive devices, the matters that are at issue here will not be going into the jury room with you, so what we can do is-can you get those matters and set them on the table-and then I'll let you look at them, and then you can go into the jury room.

Lussier did not object to this remark at trial, but contends on appeal that by referring to the $CO_2$ devices as "destructive devices"; the district court erred.

Because Lussier failed to raise an objection at trial, we review this remark for plain error. *See United States v. Jackson,* 84 F.3d 1154, 1158 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 445, 136 L.Ed.2d 341 (1996). Plain error is an error that is clear, plain, or obvious. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). Before a judgment will be reversed for plain error, the defendant must show that the error affected his "substantial rights," that is, "[i]t must have affected the outcome of the District Court proceedings." *Id.*

In the present case, the court's remark cannot be seen as anything more than an inadvertent slip of the tongue. The judge was not commenting on the evidence, but allowing the jury to view the devices before entering the jury room. She quickly corrected herself without drawing attention to the

---

6. It may be possible to conceive of a "combination-of-parts" case in which the Government could successfully proceed on a "design" theory without showing "intent." To date, however, the subsection (C) cases before this court have proceeded under the intent prong. Our discussion in this case is not meant to foreclose the possibility that a "design" case could be successfully presented.

7. Lussier's individual arguments that the district court erred in denying his motion in limine, in refusing to give his proposed jury instructions, and in admitting the testimony of an expert witness were all based on his contention that the Government was required to prove that he intended to use the $CO_2$ devices as weapons. Because we conclude that the Government did not need to prove his intent in possessing the devices, these arguments fail.

mistake. The jury at this point was not being formally instructed in the law, but hearing procedural rules such as what to take into the jury room and how to communicate with the bailiff. Lussier's counsel, who had been vigilant in raising objections throughout the proceedings, entirely failed to notice the remark; he neither objected at the time nor before the end of the trial.

In the context of the entire trial, the error was even more trivial. The judge was scrupulously impartial during all proceedings before the jury. She did not exercise her discretion to comment upon the evidence, nor was there any apparent difference in treatment of counsel or witnesses for the prosecution and defense. Indeed, earlier in the trial the judge had committed a more obvious, and potentially prejudicial, error in favor of the defendant. While formally instructing the jury on Lussier's theory of the case, she stated, "The devices in dispute are not destructive devices because they were not designed or redesigned for use as weapons." As with the later remark, the judge quickly corrected herself without putting undue emphasis on the misstatement: "That's his contention. Mr. Lussier contends that the devices in dispute are not destructive devices because they were not designed or redesigned for use as weapons."

The court's remark does not rise to the level of conduct that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776. This was an isolated instance in the midst of trial conducted without prejudice to the defendant. Furthermore, the remark was made inadvertently and was unobtrusively corrected. We therefore find that the district court did not commit plain error.

### III

We hold that the Government was not required to prove Lussier's actual intent in possessing the $CO_2$ devices, and that the district court did not commit plain error when it called the $CO_2$ devices "destructive devices" in front of the jury. We therefore affirm the judgment of conviction.

AFFIRMED.