**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JASON PAUL SCHAEFER,
*Defendant-Appellant.*

No. 19-30266

D.C. No.
3:17-CR-00400-HZ-1

OPINION

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, Chief District Judge, Presiding

Argued and Submitted August 13, 2021
Seattle, Washington

Filed September 16, 2021

Before: David M. Ebel,* Carlos T. Bea, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bea

---

* The Honorable David M. Ebel, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel affirmed a criminal judgment in a case in which a jury convicted Jason Schaefer of a variety of offenses, including assault on a federal officer (18 U.S.C. § 111(a)–(b)) and possession of an unregistered destructive device (26 U.S.C. §§ 5841, 5861(d), 5871).

The panel held that the district court did not err in finding that Schaefer knowingly and intelligently waived his right to counsel. Schaefer did not strongly dispute that during the *Faretta* hearing on his request to proceed pro se, the district court ensured that he understood the nature of the charges and the dangers and disadvantages of self-representation. Whether he understood "the possible penalties" was more challenging. This court hadn't previously directly encountered a circumstance in which the district court inaccurately identified the defendant's minimum sentence. Declining to adopt a rigid rule, the panel saw no reason to apply a different rule to the defendant's knowledge of the minimum penalties than that which this court applies to the defendant's knowledge of the maximum penalties, and therefore held that to find a defendant knowingly and intelligently waived his right to counsel, he must have substantially understood the severity of his potential punishment under the law and the approximate range of his penal exposure. Applying that standard, the panel found that Schaefer substantially understood the grave severity of his

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

potential punishment and the protracted range of penal exposure.

The panel held that the district court, which was mindful of Schaefer's conduct throughout, did not abuse its discretion in declining to reappoint counsel once trial commenced and the jury was sworn. About a month after Schaefer was deemed competent and waived his right to counsel, the parties proceeded to trial. Schaefer represented himself throughout voir dire, but directly after the jury was sworn, he abruptly changed his mind and attempted to reinvoke his right to counsel. The panel wrote that (1) the district court properly found that reappointment of counsel to represent him would have caused delay because Schaefer made the request on the first day of trial after the jury was already impaneled; (2) the district court properly found that Schaefer's conduct was dilatory in attempting to manipulate the court and his own counsel; and (3) the last-minute request was entirely within Schaefer's control.

The panel held that the district court did not abuse its discretion in denying Schaefer's motion to compel the Government to produce its trial materials, which Schaefer sought after it was discovered post-trial that the Government's legal assistant previously worked for the state public defender's office and, in that capacity, participated in a "substantive interview" with Schaefer in connection with a state prosecution that occurred a few months before the events giving rise to the instant charges. Schaefer contended that access to the materials could have revealed a violation of his Fifth Amendment right to due process or Sixth Amendment right to counsel. The panel held that the district court did not clearly err in finding, and Schaefer did not adequately refute, that there was no evidence of tainted material at trial. The panel noted as well that the alleged

misconduct focused solely on the prior state prosecution, which had nothing to do with obtaining the explosive materials involved in this case.

The panel held that Schaefer's homemade explosive device constitutes a "destructive device" under 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f), rejecting Schaefer's argument that the statutes were intended to cover only "military-type weapons."

The panel held that the district court did not violate Schaefer's rights under the Speedy Trial Act. The panel wrote that Schaefer neither alleged that a single day was improperly excluded from the 70-day limit set forth in 18 U.S.C. § 3161(h) nor provided relevant authority to support his contention that the district court somehow "constructively denied" him his right to a speedy trial.

**COUNSEL**

Susan Russell (argued), Assistant Federal Public Defender, Office of the Federal Public Defender, Portland, Oregon; for Defendant-Appellant.

Amy E. Potter (argued), Deputy Criminal Chief, Criminal Appeals Section; Scott Erik Asphaug, Acting United States Attorney; United States Attorney's Office, Eugene, Oregon; for Plaintiff-Appellee.

**OPINION**

BEA, Circuit Judge:

The Sixth Amendment guarantees a criminal defendant the right to counsel. This familiar privilege is so culturally well-known that we readily understand its advantageous purpose. But its converse is less well-known: the Sixth Amendment also guarantees the criminal defendant the right to proceed *without* counsel. This privilege is equally as important. Indeed, "[t]he Supreme Court has stated that, even if 'the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant,' it merits the same vigilant protection as other constitutional rights." *United States v. Gerritsen*, 571 F.3d 1001, 1008 (9th Cir. 2009) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)). We should be careful, then, not to disregard this constitutional right because "[w]hen the administration of the criminal law . . . is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution." *Faretta v. California*, 422 U.S. 806, 815 (1975) (citation omitted). Today, we are tasked with examining the imperative right to proceed with and without counsel.

This challenging task began with a menacing act. In October 2017, Jason Schaefer ignited a homemade explosive device when officers attempted to arrest him. The Government charged him with a variety of crimes, including assault on a federal officer and possession of a "destructive device." Schaefer then spent the next eighteen months with a rotating cast of counsel, firing one after the other. About a month before trial, however, Schaefer reached a different

decision. He decided that he was better off on his own, without a lawyer to represent him, and thus sought to proceed pro se. After holding a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the district court acquiesced and ruled that Schaefer unequivocally, knowingly, and intelligently waived his right to counsel. All was well again—for the moment. Although trial commenced with Schaefer representing himself, he abruptly changed his mind once the jury was empaneled and attempted to reinvoke his right to counsel. Finding that Schaefer was attempting to manipulate the legal proceedings by his demand for counsel to represent him, the district court denied the request but continued the appointment of advisory counsel to Schaefer, so to provide him with the availability of legal advice. A jury ultimately convicted him of all counts. We now examine, among other issues, whether Schaefer's constitutional right to self-representation and right to counsel were violated.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Schaefer's prior state prosecution

Schaefer had a long history of mental illness and had been hospitalized prior to the instant prosecution. In April 2017, for example, the local police received a tip that Schaefer "had poured something outside of [his] garage that was a chemical that caused concern to the apartment complex."[1] Upon arriving at the scene, Schaefer "became confrontational with law enforcement and was angry and threatened to kill the apartment complex manager." Officers arrested him and placed him on a mental health hold.

---

[1] Schaefer later admitted that he had used liquid mercury, a highly toxic substance, "as a deterrent to keep people from entering his garage."

Officers quickly discovered that he was wearing a "body armor vest" and, because he had a prior felony conviction in New York, charged him with being a Felon in Possession of Body Armor under Oregon state law. He was convicted and sentenced to probation.

## B. Schaefer detonates an explosion, initiating federal prosecution

Later that same year, in September 2017, the FBI received a tip that Schaefer had purchased a variety of unusual chemicals. FBI Special Agent Mutchler reviewed the list of chemicals and recognized that several of them could be combined to manufacture an improvised explosive device.

On October 11, 2017, the FBI obtained a search warrant for Schaefer's home and storage unit. SA Mutchler arranged to have Schaefer attend a probation meeting that morning away from Schaefer's home. SA Mutchler attended the meeting and told Schaefer about the search warrant. Schaefer then left, and the officers who had been surveilling him were unable to follow him. By the time Schaefer arrived at his home, officers were already executing the search warrant. Officers attempted to arrest Schaefer at that time, but he refused to comply. Schaefer yelled at the officers— "Oh, great. Now we're all going to die."—and sped away again.

Officers chased after Schaefer and finally caught up to him once he became stuck in traffic. Officers approached and ordered him out of his vehicle. In response, Schaefer grabbed a cigarette package that contained triacetone triperoxide ("TATP") and threatened the officers: "I'll do it. I'll do it. I'll blow us all up." Schaefer then lit the cigarette

package, causing an explosion.[2]   As a result of the blast, Schaefer lost three fingers, and one of the officers suffered from a concussion and temporary deafness.

## C. Schaefer requests self-representation during pre-trial proceedings

Schaefer was taken to a hospital in police custody.  On October 24, 2017, he was indicted by a grand jury for Assault on a Federal Officer (two counts), and Using an Explosive to Commit a Federal Felony.[3]  During the pre-trial proceedings that followed the district court appointed—and Schaefer terminated—several attorneys.  The district court appointed the first attorney to represent him at the initial appearance on October 19, 2017.  After the first attorney moved to withdraw in January 2018, the district court granted the request and appointed the second attorney to represent him.  The district court also appointed another attorney (the third) as co-counsel on May 22, 2018. However, discord followed soon thereafter.

On May 29, 2018, the second and third attorneys moved to withdraw based on an "unreconcilable [sic] conflict of interest."[4]  The district court held a hearing the next day,

---

[2] Forensic analysts later concluded that the cigarette package contained TATP, a high explosive that can be made from hydrogen peroxide, acetone, and sulfuric acid.  Those chemicals, and a few additional chemicals, were found in Schaefer's home.

[3] The initial indictment charged Schaefer under 18 U.S.C. §§ 111(a), 111(b), and 844(h).  The prosecution filed three superseding indictments before trial.

[4] Portions of the excerpts of record submitted by the parties were filed under seal.  We include only quotations from the sealed record that

ultimately granting the motion and appointing the fourth attorney to represent him.

In June 2018, the fourth attorney moved for a competency evaluation of Schaefer. The district court held a hearing, reviewed the competency evaluation in the expert report, and concluded that Schaefer was competent to stand trial. The fourth attorney then moved to withdraw because he disagreed with certain "frivolous" motions that Schaefer had wanted to file and because Schaefer had filed a complaint against him with the State Bar. Schaefer informed the district court that he was "tempted to proceed pro se" because he had "conducted an extensive amount of research" for the case. The district court cautioned him, however, that proceeding pro se was not in his best interest. Although the district court denied the fourth attorney's motion to withdraw, it appointed the fifth attorney, Lisa Ludwig, as co-counsel.

But in November 2018, the fourth attorney again moved to withdraw. The district court granted the motion this time and elevated Ms. Ludwig to counsel representing Schaefer. Ms. Ludwig informed the district court that she was "happy to continue as Mr. Schaefer's attorney," but that she was "not going to be able to competently be prepared to take over this whole case and be ready to go to trial" before the set trial date in January 2019. Schaefer objected to a continuance, insisting that the district court maintain the existing trial schedule. In response, the district court explained the consequences of this decision:

---

do not reveal importantly confidential information. To the limited extent the sealed record is quoted in this opinion, we hereby deem it unsealed.

So what that means is that Ms. Ludwig will be trying the case ill prepared. And you will have to accept that and whatever result comes of that.

And what you cannot do is come back and say, "I want to challenge"—if you get convicted—"I want to challenge the conviction because my lawyer wasn't prepared." Because what's going to happen is I'm going to make a very clear record that says Ms. Ludwig put on the record she is not ready to try this case. You are forcing her to proceed ill prepared, and you will live with whatever the consequences of her being ill prepared are.

So just think about that for a minute. . . . And if you want your trial on the date that it's scheduled, you get it, with that agreement, with that understanding.

Schaefer responded, "I'm not going to waive my speedy trial right in lieu of my right to competent and effective assistance of counsel." The district court ultimately kept the existing trial date, but appointed Tiffany Harris (the sixth attorney) to serve as Ms. Ludwig's co-counsel.

In December 2018, the Government filed a motion for a second competency evaluation because Schaefer had filed "unusual" motions and appeared "unhinged." The district court ordered the competency evaluation and continued the trial date, which had been set for the following month. On April 2, 2019, the district court held a hearing and determined—for the second time—that Schaefer was

competent to stand trial. During the same hearing, the district court also addressed Ms. Ludwig and Ms. Harris's motion to withdraw on the ground that Schaefer had "wishe[d] to discharge current counsel [that represented him] and seek the appointment of standby counsel." Schaefer confirmed, "I would appreciate standby counsel, someone who acts in an advisory capacity."[5] As a result, the district court held a hearing to determine whether Schaefer knowingly and intelligently waived his constitutional right to counsel, pursuant to *Faretta v. California*, 422 U.S. 806 (1975).

The district court first asked the Government to explain "the nature of the charges" in the then-operative indictment and "the possible consequences of being convicted of those charges." The Government specified that one of the counts, the violation of 18 U.S.C. § 924(c)(1)(B)(ii), carried a mandatory minimum of thirty years and a potential maximum of life. The Government also recounted the penalties associated with three other counts, none of which carried mandatory minimums. But, not anticipating a *Faretta* hearing that day, the Government was unable to recall the penalties or enhancements associated with the remaining two counts of Using and Carrying an Explosive to Commit a Federal Felony in violation of 18 U.S.C. § 844(h)(1) and § 844(h)(2). The district court emphasized that Schaefer faced a mandatory minimum of thirty years and a potential maximum of life. The district court also

---

[5] In contrast to the phrases "counsel" and "counsel to represent" the defendant, which we use interchangeably here, the term "standby counsel" describes "the situation when a pro se defendant is given technical assistance by an attorney in the courtroom, but the attorney does not participate in the actual conduct of the trial." *United States v. Salemo*, 81 F.3d 1453, 1464 (9th Cir. 1996).

advised that "it is *possible* that sentences could run consecutively to each other." In fact, a violation of either 18 U.S.C. § 844(h)(1) or § 844(h)(2) carries a *mandatory* term of ten years that "shall not . . . run concurrently with any other term of imprisonment including that imposed for the felony in which the explosive was used or carried." After underscoring the benefits of retaining counsel to represent him, the district court concluded that Schaefer had "knowingly, voluntarily, and intelligently waiv[ed] his right to counsel" because he had "indicated that he understands . . . the nature of those charges against him, what the elements of those particular charges are, and the possible penalties he may face."

At this time, the district court also addressed Schaefer's request for standby counsel. Schaefer explained that he had filed a malpractice suit against Ms. Ludwig and that he was "not comfortable with her proceeding as standby counsel." Recognizing that Ms. Ludwig and Ms. Harris "ha[ve] the highest level of familiarity with this case," the district court denied the request and retained them as standby counsel. The district court cautioned, however, that "standby counsel is not going to be prepared to try this case in the same way that an actual lawyer would be prepared to try this case."

Two weeks later, on April 16, 2019, Schaefer requested different standby counsel. The district court explained the difficulty behind the request, given that trial was scheduled to begin in a few weeks. Schaefer maintained his request for different standby counsel, but adamantly objected to continue the scheduled trial date:

> [M]y interests on this matter are . . . first and foremost, going to trial May 6th; secondly, having standby counsel; and after that, it's kind of anything goes. If the Courts can't

> appoint standby counsel, they can't appoint
> standby counsel. If the Courts see fit that
> only Lisa Ludwig and Tiffany Harris can
> continue as standby counsel to meet the May
> 6th trial date, that's the decision that the
> Courts reach.

The district court ultimately denied the request for different standby counsel because it could not find another attorney on such short notice and ordered that Ms. Ludwig and Ms. Harris remain as standby counsel.

On April 18, 2019, the Government filed the third—and final—superseding indictment, charging Schaefer with eight counts: **(1–2)** Assault on a Federal Officer, 18 U.S.C. § 111(a)–(b); **(3)** Carrying and Using a Destructive Device During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(B)(ii); **(4)** Using an Explosive to Commit a Federal Felony, 18 U.S.C. § 844(h)(1); **(5)** Carrying an Explosive During the Commission of a Federal Felony, 18 U.S.C. § 844(h)(2); **(6)** Unlawful Transport of Explosive Materials, 18 U.S.C. §§ 842(a)(3)(A), 844(a); **(7)** Possession of an Unregistered Destructive Device, 26 U.S.C. §§ 5841, 5861(d), 5871; and **(8)** Felon in Possession of Explosives, 18 U.S.C. §§ 842(i)(1), 844(a). At his arraignment, Schaefer informed the district court that he had read the new indictment, understood the charges, and waived a full reading. When the district court asked the Government to summarize the potential penalties, Schaefer responded, "I don't need to hear that, Your Honor. I understand the penalties quite well."

### D. Schaefer changes his mind and seeks counsel during trial

Trial commenced on May 6, 2019. Schaefer proceeded pro se, with standby counsel at his side. After the jury was sworn, however, Schaefer requested that Ms. Ludwig "assume the position of representing counsel." Ms. Ludwig informed the district court that she and Ms. Harris had "prepare[d] for the possibility that [they] would need to take over in the middle of trial," but that they were "not prepared to take over [Schaefer's entire] defense." Consequently, Ms. Ludwig requested a thirty-day continuance to prepare an adequate defense. She also characterized this eleventh-hour request as an "IAC [ineffective assistance of counsel] trap and a civil suit trap" because Schaefer had admitted to her that "[t]his . . . was just a way to force you to be ready for trial." The district court then addressed Schaefer:

> **District court:** I take it that no matter what, you still want to proceed to trial.
>
> **Schaefer:** Absolutely, Your Honor. They've [Ms. Ludwig and Ms. Harris] been on the case for nine months. Of course they're asking for another continuance, like they've asked for many continuances over the course of this case. It's time for trial. It's not really that complicated.
>
>              \*     \*     \*
>
> **Schaefer:** If it comes down to it, I would rather represent myself and continue to trial today, but I do want her to represent me in trial today.

After a short recess, the district court denied the request for counsel to represent Schaefer at trial.  Noting that Schaefer "ha[d] been manipulating [the district court] and his lawyers" and "trying to use gamesmanship in order to manipulate [the district court] once again," the district court found that the request was "going to cause delay."  The district court noted that Schaefer had previously waived his right to counsel and that it would "honor[] that prior waiver." Schaefer had "chosen his own path, and he must live with that choice."

The parties then proceeded to trial, with Schaefer representing himself and Ms. Ludwig and Ms. Harris functioning as standby counsel.  Schaefer cross-examined the Government's witnesses, called his own witnesses, and offered his own exhibits.  The jury ultimately convicted him on all counts.

## E.  Post-trial motions and proceedings

The day after the verdict, Ms. Ludwig and Ms. Harris renewed their motion to withdraw as standby counsel. Schaefer also renewed his request for the appointment of counsel to represent him.  The district court granted both requests and appointed new counsel to represent Schaefer, Schaefer's seventh attorney.

Schaefer, through counsel, moved to dismiss several counts.  The district court granted the motion in part, dismissing Count 8 (Felon in Possession of Explosives) for being unconstitutionally vague.[6]  But the district court refused to dismiss Counts 3 and 7, rejecting the contention that the Government had failed to prove that Schaefer had

---

[6] The Government does not challenge that holding.

carried and used a "destructive device" as defined in 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f).

Schaefer also moved to compel the Government to produce its trial materials. It had been discovered shortly after trial that the Government's legal assistant had previously worked for the state public defender's office and, in that capacity, had participated in a "substantive interview" with Schaefer in connection with the April 2017 state prosecution for felon in possession of body armor, which occurred a few months before the events giving rise to the instant charges. The legal assistant submitted a declaration in which she asserted that she had no recollection of the interview,[7] but the district court reviewed a summary of the interview and determined that it contained "significant information," causing the court to "call into question [the legal assistant]'s veracity in a very serious way." The district court noted that although the interview regarded Schaefer's prior state prosecution for felon in possession of body armor, there had been "significant efforts [by the Government] during the course of the trial to introduce [Rule 404(b) prior acts] evidence regarding that prior case." The defense identified seventeen pieces of information for which the legal assistant may have transmitted privileged information, but the Government conducted a review and identified an independent source for each piece of information. The district court also conducted an *in camera* review of the Government's trial materials to determine whether any information "must have come from [the legal

---

[7] The Government also submitted thirty-three other declarations from current and former employees, who asserted that the legal assistant had not provided them with any information about any communications with Schaefer while she had worked for the state public defender's office.

assistant] because there was no other source." But the district court ultimately denied the motion to compel, concluding that there was "no evidence of spillage from [the legal assistant] to anyone in the U.S. Attorney's Office."

The district court imposed a sentence of forty years. In doing so, the district court determined that Count 3 required a thirty-year minimum. The district court also found that Count 4 for "us[ing] . . . an explosive to commit" a felony and Count 5 for "carr[ying] an explosive during" a felony merged into a single count under the facts of the case and, accordingly, required only one consecutive ten-year minimum. Finally, the district court held that time had been served for the remaining counts during the pre-trial detention. Schaefer now challenges his convictions and sentence.

## II. JURISDICTION

We have jurisdiction under 28 U.S.C. § 1291.

## III.  DISCUSSION

### A. Schaefer was not denied his Sixth Amendment right to counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "The Sixth Amendment not only guarantees the right to counsel, but also guarantees the converse right to proceed without counsel at trial." *United States v. Farias*, 618 F.3d 1049, 1051 (9th Cir. 2010). Here, we must address both of these critical constitutional rights. Schaefer urges us to vacate his convictions because the district court deprived him of his right to counsel by (1) erroneously determining

that he knowingly and intelligently waived his right to counsel; and later (2) erroneously declining to reappoint counsel after he changed his mind and attempted to reinvoke his right to counsel. We disagree with both his claims and find no such errors.

### 1. The district court did not err in finding that Schaefer knowingly and intelligently waived his right to counsel

"In order to invoke the right to self-representation, a criminal defendant must make a timely 'unequivocal, voluntary, [and] intelligent' request." *Farias*, 618 F.3d at 1051 (citation omitted).[8] "Once a defendant makes an unequivocal request to proceed pro se, the court must hold a hearing—commonly known as a *Faretta* hearing—to determine whether the defendant is knowingly and intelligently forgoing his right to appointed counsel." *Id.* at 1051–52; *see also Faretta*, 422 U.S. at 835. At a minimum, the district court "must ensure that a defendant

---

[8] As a threshold issue, we determine that the district court did not clearly err in finding that Schaefer's waiver was "unequivocal." *See United States v. Mendez-Sanchez*, 563 F.3d 935, 944 (9th Cir. 2009) (reciting standard). Schaefer certainly requested standby counsel in an advisory capacity. But this request does not negate his fervent insistence that he terminate the counsel that represented him and proceed pro se, especially given his clearly outlined priorities: "[M]y interests on this matter are . . . first and foremost, going to trial May 6th; secondly, having standby counsel; and after that, it's kind of anything goes." Besides, the district court had consistently cautioned that "standby counsel is not going to be prepared to try this case in the same way that an actual lawyer would be prepared to try this case." *See United States v. Moreland*, 622 F.3d 1147, 1155–57 (9th Cir. 2010) (rejecting defendant's argument that he did not waive right to counsel because district court had "strongly urged" him to obtain counsel and "did not promise any specific degree of assistance" from standby counsel).

understands: (1) the nature of the charges against h[im]; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation." *United States v. French*, 748 F.3d 922, 928–29 (9th Cir. 2014) (internal citations omitted). "Whether a defendant knowingly and voluntarily waives his Sixth Amendment right to counsel is a mixed question of law and fact reviewed de novo." *Mendez-Sanchez*, 563 F.3d at 944.

Here, the first and third factors are not strongly disputed. During the *Faretta* hearing, the district court ensured that Schaefer understood "the charges against him" by outlining the offenses in the then-operative indictment. Schaefer then confirmed that he had read the indictment and had "been advised of and underst[ood] the nature of the charges against [him]." The district court also ensured that Schaefer understood "the dangers and disadvantages of self-representation." Although there is no "set formula or script," *French*, 748 F.3d at 929, we have advised that "there must be some instruction or description, however minimal, of the specific dangers and disadvantages of proceeding pro se." *United States v. Hayes*, 231 F.3d 1132, 1137–38 (9th Cir. 2000). Consistent with the prototypical instruction,[9] the

---

[9] Specifically, we have suggested that district courts provide defendants with the following instruction:

The court will now tell you about some of the dangers and disadvantages of representing yourself. You will have to abide by the same rules in court as lawyers do. Even if you make mistakes, you will be given no special privileges or benefits, and the judge will not help you. The government is represented by a trained, skilled prosecutor who is experienced in criminal law and court procedures. Unlike the prosecutor you will face in this case, you will be

district court adequately cautioned Schaefer by delineating an extensive list of disadvantages to self-representation. *See United States v. Lopez-Osuna*, 242 F.3d 1191, 1198–1200 (9th Cir. 2000) (affirming conviction and holding that defendant waived right to counsel where court cautioned him about self-representation and "very competent advisory counsel" assisted him).

That being said, the remaining factor—whether Schaefer understood "the possible penalties"—is more challenging. Schaefer was advised that he faced a mandatory minimum of thirty years and a potential maximum of life.[10] Problematically, however, Schaefer was not advised that 18 U.S.C. § 844(h)(1) and § 844(h)(2) each impose an obligatory term of ten years to be served consecutively with the sentence for the underlying felony. Although it may have appeared quite likely at the time of Schaefer's waiver

> exposed to the dangers and disadvantages of not knowing the complexities of jury selection, what constitutes a permissible opening statement to the jury, what is admissible evidence, what is appropriate direct and cross examination of witnesses, what motions you must make and when to make them during the trial to permit you to make post-trial motions and protect your rights on appeal, and what constitutes appropriate closing argument to the jury.

*Hayes*, 231 F.3d at 1138–39.

[10] This advisement on April 2, 2019 concerned the second superseding indictment filed on November 15, 2018. On April 18, 2019 the defendant was charged with a third superseding indictment, which included the charges in the second superseding indictment and two additional charges. Since the charges exclusive to the third (and final) superseding indictment carry no minimum penalties, 18 U.S.C. § 844(a)(1), 26 U.S.C. § 5871, Schaefer faced the same mandatory minimum sentence at the April 2, 2019 advisement and at trail.

that the district court would find that Schaefer's counts under 18 U.S.C. § 844(h)(1) ("us[ing] . . . an explosive to commit" a felony) and § 844(h)(2) ("carr[ying] . . . an explosive during the commission" of a felony) merged into a single count, this holding was not made until the sentencing hearing. And, rather than stress the mandatory nature of this stacking provision, the district court warned only "*it is possible* that sentences could run consecutively to each other." Thus, although it was made clear that Schaefer's sentencing range was *thirty* years to life, his actual sentencing range—with § 844(h)'s stacking provision and assuming the merger of Schaefer's counts under that subsection—was *forty* years to life.

We have not directly encountered a circumstance in which, like here, a district court incompletely identified only the defendant's *minimum* sentence. Instead, we usually encounter circumstances in which the district court inaccurately identified the defendant's *maximum* sentence. *See United States v. Erskine*, 355 F.3d 1161, 1169–71 (9th Cir. 2004) (focusing exclusively on whether defendant understood the *maximum* penalty and holding that defendant did not waive right to counsel where he was advised that the maximum penalty was three, not five, years); *see also, e.g.*, *United States v. Forrester*, 512 F.3d 500, 507–509 (9th Cir. 2008) (vacating conviction where district court overstated potential penalties by advising defendant that he faced ten years to life in prison, though he actually faced a range of zero to twenty years in prison). In those circumstances, we evaluated the defendant's "awareness of the range of possible penalties," and whether the defendant understood "the magnitude of the loss" he faced and "knew of his substantial penal exposure." *Arrendondo v. Neven*, 763 F.3d 1122, 1131–36 (9th Cir. 2014) (citing *Iowa v. Tovar*, 541 U.S. 77, 81 (2004)).

We recently rejected a *per se* rule that would have invalidated an otherwise valid waiver on the grounds that the district court failed to "recite a particular script" about the defendant's charges and potential maximum penalties, despite the defendant's avowal that he understood the charges and maximum penalties he faced. *United States v. Audette*, 923 F.3d 1227, 1235–36 (9th Cir. 2019) (citation omitted). In *Audette*, the district court inquired whether the defendant had read the indictment, understood the charges against him, and was aware of the maximum penalties. *Id.* at 1231–32. After convening with counsel who represented him, and despite the district court's recommendation that he maintain such counsel, the defendant confirmed that he wished to proceed pro se. *Id.* at 1232. The defendant argued on appeal, however, that his waiver was not knowing and intelligent because the court merely asked whether he was aware of those details, rather than "specifically review with [him] the elements of the offense or the maximum penalties." *Id.* Rejecting that argument, we clarified that "the focus of our analysis . . . is whether 'a fair reading of the record as a whole' indicates that the defendant 'understood the dangers and disadvantages of self-representation.'" *Id.* at 1235 (citation omitted). We concluded that "the exchange between [the defendant] and the court [had] demonstrate[d] that [the defendant] understood those risks." *Id.* at 1236.

Along the same lines, here, we again decline to adopt a rigid rule. *See Gerritsen*, 571 F.3d at 1010–11 (explaining that "[t]he Supreme Court has directed us to take a pragmatic approach to the waiver question" and "warn[ed] not to establish rigid requirements that must be met before a defendant is deemed to have effectively waived counsel" (citing *Tovar*, 541 U.S. at 90, 92)). We see no reason to apply a different rule to the defendant's knowledge of the

minimum penalties than that which we apply to the defendant's knowledge of the maximum penalties. Therefore, we hold that to find a defendant knowingly and intelligently waived his right to counsel, he must have substantially understood the severity of his potential punishment under the law and the approximate range of his penal exposure. Ideally, of course, a district court should strive to ensure that the defendant unquestionably understands all possible penalties, including any statutory minimums, maximums, and stacking provisions. But the court must consider the particular circumstances. For example, considerations that weigh in favor of the validity of a waiver of the right to counsel include the assistance of counsel at the time of the waiver and the clarity with which statutory penalties are outlined in an indictment. At bottom, "our fundamental task is to determine whether a defendant who invokes his right under *Faretta* 'knows what he is doing and his choice is made with eyes open.'" *Gerritsen*, 571 F.3d at 1008 (quoting *Faretta*, 422 U.S. at 835).

Applying this standard to the instant circumstances, we find that Schaefer substantially understood the grave severity of his potential punishment and the protracted range of penal exposure. Schaefer undoubtedly understood that he risked spending the rest of his life in prison. Not only did his competency evaluation conclude that he understood the basis of the charges and the severe penalties associated with those charges, but the district court repeatedly stressed the magnitude of a potential life sentence. Schaefer also understood that he faced a lengthy mandatory minimum penalty. Schaefer requested the district court to dispense with a reading of the third superseding, last and operative indictment, to which he was entitled at his arraignment, volunteering to the district court that he "underst[ood] the penalties quite well." That indictment, like the one before it,

contained charges under 18 U.S.C. §§ 844(h)(1)–(2) and 924(c)(1)(B)(ii) that carried mandatory minimum penalties. And, at the *Faretta* hearing, Schaefer stated that he understood that his sentences could run consecutively to each other. Schaefer also enjoyed the benefit of counsel who represented him from his initial arrest in October 2017 until his *Faretta* hearing in April 2019, and thereafter the benefit of advisory counsel.

That is not to say that we are unconcerned with the imprecise language used during the *Faretta* hearing. Although the district court's advisement—that "it is possible that sentences could run consecutively to each other"—may not have been incorrect, it was certainly incomplete. But we also appreciate that we are the beneficiaries of hindsight. We now know that the district court ultimately imposed the possibility: a consecutive ten-year sentence under § 844(h). However, the reach of § 844(h)'s stacking provision was hotly contested during the sentencing hearing: the Government advocated for a sixty-year sentence by arguing that § 844(h) required the district court to stack multiple counts, whereas defense counsel advocated for a thirty-year sentence by arguing that § 844(h) did not allow stacking multiple counts based on the same underlying conduct.

Certainly, viewed under this lens, the focus becomes a bit blurrier. To be sure, "[a] statutory enhancement . . . is not an element of the crime" and thus "need not be alleged in the indictment and proven to a jury, but is determined by the court after the defendant has been convicted." *Gerritsen*, 571 F.3d at 1009. Therefore, when "neither the prosecutor nor the court can authoritatively determine whether sentencing enhancements will affect the sentencing range" until the sentencing hearing, the advisement of such enhancements surely provide a clearer picture of the

defendant's approximate range of penal exposure, but the absence thereof will not nullify an otherwise valid waiver. *See id.* at 1009–11 (affirming conviction and holding that defendant knowingly waived his right to counsel even though the government overstated the maximum penalty by including a potential statutory enhancement). Accordingly, we conclude that the district court did not err in finding that Schaefer knowingly and intelligently waived his right to counsel.[11]

### 2. The district court did not err in declining to reappoint counsel once trial commenced and the jury was sworn

About a month after Schaefer was deemed competent and waived his right to counsel, the parties proceeded to trial.[12] Schaefer represented himself throughout voir dire,

---

[11] Two unpublished dispositions further support our holding. *See, e.g.*, *Campbell v. Virga*, 613 F. App'x 651, 652 (9th Cir. 2015) (holding that defendant waived right to counsel where trial court advised only that he faced a maximum life in prison because "[a] precise understanding of the exact range of potential sentences has not been required"); *Twitty v. Maass*, Nos. 89-35647, 89-35648, 1990 WL 178018, at *2 (9th Cir. 1990) ("While it is clear that the trial judge and the prosecutor were mistaken as to the applicability of the mandatory minimum sentencing statute, we agree with the district court's conclusion that his plea was not constitutionally invalid because the defendant was not aware of a potential minimum sentence, and the court did not commit constitutional error in not advising him of a potential minimum sentence.").

[12] Throughout these appellate proceedings, defense counsel has consistently described Schaefer as "mentally ill," perhaps thinking to gain a more generous standard by which Schaefer's actions are considered. However, the Supreme Court has held that a defendant need not be "more competent" to "waive[] his right to the assistance of counsel" than a defendant who is competent to stand trial represented by

but directly after the jury was sworn, he abruptly changed his mind and attempted to reinvoke his right to counsel. Ms. Ludwig, acting as standby counsel, informed the district court that she was "not prepared to take over [Schaefer's entire] defense" but that she "could be prepared within maybe 30 more days."  Ms. Ludwig also characterized this unexpected invocation as an "IAC [ineffective assistance of counsel] trap and a civil suit trap" because Schaefer had admitted to her that "[t]his . . . was just a way to force [her] to be ready for trial."  This concern was reasonable as Schaefer had already filed a malpractice suit against her. The district court ultimately found that such reappointment would cause delay, noting that Schaefer has been "manipulating [the district court] and his lawyers for a long time now and has put himself in the position where he's trying to use gamesmanship in order to manipulate [the district court] once again."

---

counsel.   *Godinez v. Moran*, 509 U.S. 389, 398–400 (1993). Subsequently the Supreme Court held that the Constitution does not *prohibit* a judge from requiring representation for a defendant found sufficiently competent to stand trial but not sufficiently competent to conduct trial proceedings, yet reaffirmed that a court may "*permit* [such] a gray-area defendant to represent himself."  *Indiana v. Edwards*, 554 U.S. 164, 173, 177–78 (2008) (emphasis original); *see also United States v. Audette*, 923 F.3d 1227, 1237 (9th Cir. 2019).  Here, the district court *twice* determined that Schaefer was competent to stand trial.  Both times, mental health experts concluded that Schaefer understood the nature of the proceedings and that he was capable of aiding and assisting in his defense.  Schaefer asserted that he understood the consequences of waiving his right to counsel and repeatedly told the trial court that he was competent.  And, in fact, Schaefer was able to articulate his priorities to the trial court, respond appropriately to questions, and conduct direct and cross-examinations at trial.  The record does not show that the trial court committed clear error by permitting Schaefer to represent himself.  *See Audette*, 923 F.3d at 1237–38.

"Generally, a decision to grant or deny a continuance is reviewed for an abuse of discretion. When the defendant's [S]ixth [A]mendment right to counsel is implicated, however, a court must balance several factors to determine if the denial was fair and reasonable." *United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986) (internal citations omitted). These factors include the following:

> [1] whether the continuance would inconvenience witnesses, the court, counsel, or the parties;
>
> [2] whether other continuances have been granted;
>
> [3] whether legitimate reasons exist for the delay;
>
> [4] whether the delay is the defendant's fault; and
>
> [5] whether a denial would prejudice the defendant.

*United States v. Thompson*, 587 F.3d 1165, 1174 (9th Cir. 2009) (quoting *Studley*, 783 F.2d at 938). "In addition, a court must be wary against the 'right of counsel' being used as a ploy to gain time or effect delay. As a result, a court may force a defendant to proceed pro se if his conduct is 'dilatory and hinders the efficient administration of justice.'" *Id.* (internal citations omitted); *see also United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir. 1979) ("[I]n some circumstances a court may constitutionally deny a continuance even when that denial results in the defendant's being unrepresented at trial."). Indeed, "the right to

counsel—once waived—is no longer absolute." *Menefield v. Borg*, 881 F.2d 696, 700 (9th Cir. 1989).

Mindful of Schaefer's conduct throughout the entire pre-trial proceedings, the district court did not abuse its discretion in denying Schaefer's request to reappoint counsel to represent him. First, the district court properly found that reappointment of counsel to represent him would have caused delay because Schaefer made the request on the first day of trial after the jury was already impaneled. *Cf. Studley*, 783 F.2d at 938–39 (affirming denial of counsel where defendant knew of the need to obtain counsel but asked for counsel "[o]n the morning of trial"); *Leavitt*, 608 F.2d at 1293–94 (affirming denial of counsel where defendant made the request the day before trial "because the government had produced its witnesses . . . and because the court believed defendant had not made an adequate showing of why he did not retain counsel earlier").

Schaefer contends that he relied on "the district court's repeated statement that standby counsel's purpose was to step in to provide attorney representation if he no longer wanted to represent himself." But the district court did not promise that Schaefer could "tag in" standby counsel as counsel to represent him at any moment. On the contrary, the district court portended that "you might change your mind," so "it's better just to have somebody represent you in this case" and not waive counsel in the first place. *Cf. McCormick v. Adams*, 621 F.3d 970, 976–79 (9th Cir. 2010) (rejecting argument that waiver was improperly induced by the trial court's statement that defendant could revisit the decision to represent himself "at any time"). In fact, the district court repeatedly warned that standby counsel "is not going to be prepared to try this case in the same way that an actual lawyer would be prepared to try this case." It should

not have been a surprise, therefore, when standby counsel requested an additional thirty days to prepare an adequate defense. Ignoring this assertion and appointing standby counsel as counsel to represent him nonetheless might have itself violated the Sixth Amendment, since Schaefer clearly prioritized his trial date over constitutionally adequate representation:

> **District court:** I take it that no matter what, you still want to proceed to trial.
>
> **Schaefer:** Absolutely, Your Honor. They've [Ms. Ludwig and Ms. Harris] been on the case for nine months. Of course they're asking for another continuance, like they've asked for many continuances over the course of this case. It's time for trial. It's not really that complicated.
>
> *   *   *
>
> **Schaefer:** If it comes down to it, I would rather represent myself and continue to trial today, but I do want her to represent me in trial today.

Second, the district court properly found that Schaefer's conduct was dilatory in attempting to manipulate the court and his own counsel. Schaefer admitted that his unexpected request to reappoint Ms. Ludwig as counsel to represent him "was just a way to force [her] to be ready for trial" on his self-imposed accelerated timeline. *Cf. Thompson*, 587 F.3d at 1174 (affirming denial of reappointment of counsel at final pre-trial conference, which occurred on the eve of trial, because defendant's conduct "was clearly 'dilatory' and the

district court properly noted the manner in which [defendant] had 'stymied' the system" in requesting numerous continuances); *United States v. Robinson*, 967 F.2d 287, 291 (9th Cir. 1992) (affirming denial of continuance to find new counsel where defendant had terminated three attorneys, the district court had "cautioned [defendant] regarding the complexities of litigation," and standby counsel had been appointed).

Finally, the last-minute request was entirely within Schaefer's control. *Cf. Moreland*, 622 F.3d at 1158 (holding that district court did not err in granting, over defendant's objection, a two-week continuance for trial where "[defendant] was clearly to blame both for the delay and for the district court not granting a longer continuance"). Schaefer contends that he did "not seek[] to delay or postpone his trial" but instead "focused on proceeding to trial as soon as possible." Though true, Schaefer waited until the jury was impaneled to request counsel to represent him, despite numerous warnings that standby counsel would not be prepared to function as counsel to represent him. Schaefer clearly put the district court in a challenging dilemma: (a) reappoint counsel to represent him and proceed to trial, thereby disregarding the attorney's explicit admission that she was unprepared; (b) reappoint counsel to represent him and continue the trial date, thereby ignoring Schaefer's fervent objection to a continuance; or (c) decline to reappoint counsel to represent him and proceed to trial, thereby denying him representation.  In light of the circumstances, the district court did not abuse its discretion in electing the last option.

**B. The district court did not abuse its discretion in denying Schaefer's motion to compel the Government to produce its trial materials**

It was discovered shortly after trial that the Government's legal assistant had previously worked for the state public defender's office and, in that capacity, had participated in a "substantive interview" with Schaefer in connection with the April 2017 state prosecution, which occurred a few months before the events giving rise to the instant charges. The legal assistant and thirty-three other current and former employees submitted declarations asserting that no privileged information had been transferred to the federal prosecution. The district court ultimately denied Schaefer's motion to compel the Government to produce its trial materials because there was "no evidence of spillage from [the legal assistant] to anyone in the U.S. Attorney's Office." Schaefer contends that this decision denied him access to materials that could have revealed a violation of his Fifth Amendment right to due process or Sixth Amendment right to counsel. Although alleged constitutional violations are reviewed de novo, *United States v. Ortega*, 203 F.3d 675, 679 (9th Cir. 2000), we review discovery questions in criminal proceedings, including those seeking to compel the government to produce evidence, for abuse of discretion, *United States v. Alvarez*, 358 F.3d 1194, 1210 (9th Cir. 2004).

Although we, unlike the district court, lack the benefit of having sifted through the Government's trial materials, Schaefer fails to prove that the district court abused its discretion in denying him access to such materials. There is no evidence that the Government used illegally procured information, "purposefully intru[ded] . . . into the attorney-client relationship," or "initiated conversation on privileged

topics." *United States v. Danielson*, 325 F.3d 1054, 1066 (9th Cir. 2003). The district court did not clearly err in finding, and Schaefer does not adequately refute, that "there was no evidence of tainted material at trial." *See id.* at 1069 (explaining that defendant must prove "substantial prejudice," which "results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial"). The Government identified an independent source for each piece of information in its trial materials. And, in addition to the legal assistant's declaration asserting that she was "not the source of any of the information identified by the defense," the Government submitted thirty-three other declarations asserting that the legal assistant had not provided the instant federal prosecution with any information about any privileged information from the April 2017 state prosecution.[13]

Schaefer does not offer any evidence that a leak actually occurred. On the contrary, Schaefer offers only mere speculation, basing his hunch entirely on the assumption that because the legal assistant could have leaked privileged information, she must have done so. This is not enough. *See United States v. Mincoff*, 574 F.3d 1186, 1200 (9th Cir.

---

[13] Further undermining Schaefer's burden to prove "substantial prejudice," the district court had granted Schaefer's motion *in limine* to exclude the Government's proposed Rule 404(b) evidence pertaining to the earlier state prosecution, which stemmed from the April 2017 state prosecution. The only reason that the jury heard such evidence was because Schaefer opened the door to it by cross-examining SA Mutchler and asking him whether he "became aware of Jason Schaefer, or myself, in April 2017" when Schaefer "was taken into custody on a mental health hold."

2009) (affirming denial of motion for *Brady/Giglio* material and explaining that "mere speculation about materials in the government's files did not require the district court to make those materials available" (internal citation omitted)). Moreover, the alleged misconduct focuses solely on the prior state prosecution, which, it will be remembered, had to do with the defendant's possession of body armor when he was taken into custody following his pouring mercury on the ground in front of his garage, and had nothing to do with obtaining the explosive materials involved in this case. *See Danielson*, 325 F.3d at 1066 (holding that defendant "had a right to counsel only on the offenses for which he had been indicted, and on any other offenses that constituted the 'same offense' under the *Blockburger* test"). The district court, therefore, did not abuse its discretion in denying him access to the Government's trial materials.

### C. Schaefer's homemade explosive device constitutes a "destructive device" under 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f)

Schaefer next argues that his homemade explosive device does not constitute a "destructive device" within the scope of 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f), entitling him to vacatur of judgment of conviction on Counts 3 and 7.[14] Both statutes define "destructive device" as follows:

> (A) any explosive, incendiary, or poison gas—

---

[14] "Although framed as sufficiency of the evidence arguments, these are statutory interpretation arguments that we review de novo." *United States v. Hong*, 938 F.3d 1040, 1050 (9th Cir. 2019).

(i)     bomb,

(ii)    grenade,

(iii)   rocket having a propellant charge of more than four ounces,

(iv)   missile having an explosive or incendiary charge of more than one-quarter ounce,

(v)    mine, or

(vi)   device similar to any of the devices described in the preceding clauses.

(B) any type of weapon . . . by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and

(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

§ 921(a)(4); *see also* § 5845(f).[15]  Both statutes also clarify that "[t]he term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon." § 921(a)(4)(C); § 5845(f).[16]

First, Schaefer's homemade device undoubtedly falls within the plain language of § 921(a)(4) and § 5845(f).  The statutes define "destructive device" to include "any explosive, incendiary, or poison gas . . . bomb."  Almost tautologically, Webster's Dictionary (2d ed. 1979) defines "bomb" as "an explosive, incendiary, or gas-filled container, for dropping, hurling, or setting in place to be exploded by a timing mechanism."  Schaefer ignited a container (the cigarette case) filled with TATP, a "high explosive," that he caused to combust, injuring himself and the officers

---

[15] "Both of the statutes under which [Schaefer] was convicted [in Counts 3 and 7] prohibit the unlawful possession of a 'firearm,' which is defined to include a 'destructive device.'" *United States v. Kirkland*, 909 F.3d 1049, 1052 (9th Cir. 2018) (citing 18 U.S.C. § 921(a)(3)(D); 26 U.S.C. § 5845(a)(8)).  We discuss these statutes together because "[b]oth statutes . . . define the term 'destructive device' in almost identical language." *Id.* (citing § 921(a)(4); § 5845(f)).

[16] We have noted that "subsection (C) applies only to materials that have not yet been assembled into a whole," while, "[i]n contrast, subsection (A) applies only to an assembled device, *i.e.*, parts that *have been converted* into a bomb or similar device." *United States v. Lussier*, 128 F.3d 1312, 1314–15 (9th Cir. 1997).  This distinction matters because if the device falls under subsection (A) as a "bomb," it constitutes a "destructive device" *per se*.  If, on the other hand, the device falls under subsection (C) as a "combination of parts," the government is required to prove an intent element: either that the device was "designed for use" as a "destructive device" or that the defendant "intended to use the device" as a "destructive device." *Id.* ("[W]e have consistently held that although either intent or design is required as an element of the crime under subsection (C), a showing of intent is not required under subsection (A).").

attempting to arrest him.  This homemade explosive device certainly fits within the definition of a "destructive device."

Second, unrebutted evidence about the nature and characteristics of the homemade device supports the jury's conclusion that it was "designed for use as a weapon."  FBI Special Agent Robert Barbieri testified that the device contained TATP, which is not commercially available "[b]ecause of its extreme sensitivity."  ATF Agent Brennan Phillips then clarified that TATP "is generally too volatile to make a good commercial explosive."  Unlike gun powder, which "is classified as a low explosive" that is "designed to burn or deflagrate," TATP is a "high explosive" that is "designed to detonate."  *Cf. United States v. Hedgcorth*, 873 F.2d 1307, 1312 (9th Cir. 1989) (affirming convictions where defendants made "napalm firebombs" from "plastic water jugs filled with gasoline, motor oil, and soap" that "were capable of producing a more intense, more concentrated and longer-lasting incendiary effect than less exotic explosives" and were "not adapted to any legitimate civilian purpose").  Contrary to the suggestion that the Government's broad interpretation of the statutes impermissibly captures and makes criminal the possession of otherwise innocuous devices, there is no evidence that TATP is a "socially useful item."  *See Lussier*, 128 F.3d at 1317 (affirming conviction where defendant inserted explosive powder and fuses into CO2 cartridges because "unrebutted evidence at trial showed that the nature and characteristics of the CO2 devices made them useful solely as weapons").  Indeed, we have classified less dangerous and less volatile devices as falling within the parameters of the statutes.  *See, e.g.*, *United States v. Peterson*, 475 F.2d 806, 810–11 (9th Cir. 1973) (affirming conviction where defendant constructed a "common street do-it-yourself variety of a readily hand-thrown incendiary bomb" by

combining "friendly item[s]" such as "fusee flare segments, black powder, cotton rope and binding tape").

Moreover, the intent with which Schaefer constructed and used the homemade device also supports the jury's verdict.[17]    When the officers approached Schaefer, he wielded the device to evade arrest.  He even warned, "I'll do it.  I'll do it.  I'll blow us all up."  This threat, coupled with the subsequent detonation,[18] strongly supports that he intended to use the device as a weapon.  *See Hedgcorth*, 873 F.2d at 1310 (affirming convictions where defendants wielded "plastic water jugs filled with gasoline, motor oil, and soap" in part because defendants "built the firebombs for the sole purpose of destroying property and intimidating people"); *see also Peterson*, 475 F.2d at 810–11 (affirming conviction where defendant acted "with evil intent" when he combined "friendly item[s]" to create "a hostile destructive device likened to a Molotov cocktail of military ingenuity but a commonly used civilian weapon of crime and violence"); *United States v. Oba*, 448 F.2d 892, 894 (9th Cir. 1971) (affirming conviction where defendant "admitted that the purpose of the device was to bomb and destroy the property of others").

Schaefer primarily argues that his homemade device was too simple to fall within the meaning of the statutes, which, he asserts, were intended to cover only "military-type weapons."  The statutes, however, do not dictate that the

---

[17] "Despite the fact that proof of intent is not an element under subsection (A) [of § 921(a)(4)], we have sometimes looked to a possessor's intent as evidence of whether a device was 'designed [or] redesigned for use as a weapon.'" *Lussier*, 128 F.3d at 1316.

[18] As a result of the blast, Schaefer lost three fingers, and one of the officers suffered from a concussion and temporary deafness.

"destructive device" be some sophisticated piece of equipment; the statutes specify merely that a device be an "explosive . . . bomb" that is "designed []or redesigned for use as a weapon." § 921(a)(4)(A). In fact, we have expressly clarified that the statutes capture "devices other than military type ordnance." *Peterson*, 475 F.2d at 810. Schaefer is not shielded from liability merely because his device failed to cause lethal or more severe injuries.[19] Accordingly, we affirm the "destructive device" convictions under Counts 3 and 7.

## D. The district court did not violate Schaefer's speedy trial rights

"The Speedy Trial Act provides that a criminal defendant's trial must normally commence within seventy days of the filing of the indictment or the defendant's initial

---

[19] Relying on *United States v. Reed*, 726 F.2d 570 (9th Cir. 1984), Schaefer also contends that his device lacks "the traditional indicia of a weapon." In *Reed*, we vacated a conviction where the defendant attempted—but failed—to destroy a building by lighting "paper-wrapped, gasoline-filled cans" because the cans were not "designed for use as a weapon." We offered a "pragmatic analysis of the kind of device involved," noting that "it would have been difficult and dangerous for a person to hold such a can, ignite the paper and then successfully use or throw the can without serious harm to himself." *Id.* at 576.

Although seemingly persuasive at first glance because Schaefer also injured himself with his homemade device, we have rejected such a broad interpretation of *Reed* where, like here, an expert testified that the device was "not adapted to any legitimate civilian purpose." *See Hedgcorth*, 873 F.2d at 1312 (affirming conviction and distinguishing *Reed* because "[u]nlike napalm firebombs, gasoline cans with holes poked in the top are common items adapted to many legitimate uses," such as "cleaning paint brushes" and "storing fuel for small machinery"). Further distinguishing *Reed*, Schaefer even admitted that he had created the device to cause loss of life—albeit his own life.

court appearance, whichever is later." *United States v. Sutcliffe*, 505 F.3d 944, 956 (9th Cir. 2007) (citing 18 U.S.C. § 3161). "However, certain periods of delay are excluded from the calculation of the seventy-day limit, including (1) delays due to competency proceedings; (2) delays between the time of filing and the prompt disposition of pretrial motions; and (3) . . . [a] finding that the ends of justice [are] served by the granting of [a] continuance." *Id.*; *see also* § 3161(h) (listing "periods of delay" that shall be excluded). The sanction for failing to comply with these limits is dismissal of the indictment. *See* § 3162(a). We review de novo an alleged deprivation of statutory and constitutional rights to a speedy trial, and we review factual findings for clear error. *Sutcliffe*, 505 F.3d at 956.

When Ms. Ludwig was elevated as counsel to represent Schaefer in November 2018, well before Schaefer waived his right to counsel, she expressed that she was "not going to be able to competently be prepared to take over this whole case and be ready to go to trial in January [2019]." Schaefer strenuously objected to a continuance, insisting that the district court maintain the existing trial schedule. In response, the district court warned that Schaefer was "forcing [Ms. Ludwig] to proceed ill prepared, and you will live with whatever the consequences of her being ill prepared are."[20] Schaefer now argues that the district court somehow "constructively denied" him his right to a speedy trial. But Schaefer's argument hinges on revisionist history: the district court actually *sustained* Schaefer's objection to a continuance, maintaining the existing trial date. The only reason that the trial did not commence the following month was because the Government shortly thereafter filed a

---

[20] It is worth noting (again) that Schaefer consistently made clear that he prioritized an earlier trial date over counsel's preparedness.

motion for a competency evaluation, which stopped the speedy trial clock. *See* § 3161(h)(1)(A). Because Schaefer neither alleges that a single day was improperly excluded nor provides a single relevant authority to support his contention, his claim fails.

**AFFIRMED.**